STATE OF NORTH CAROLINA v. JAMES ALLRED

No. 47

(Filed 13 October 1971)

1. **Homicide § 21— homicide case — sufficiency of the evidence — defendant's firing of the fatal shot.**

   The evidence of defendant's guilt of second-degree murder or manslaughter was insufficient to be submitted to the jury, the homicide having occurred during a Saturday night scuffle at a rural crossroads, where the State offered uncontradicted evidence that the homicide victim died from a .25 bullet fired from a .25 automatic pistol, but there was no evidence that defendant had such a pistol at the time of the homicide or that he fired any pistol on that occasion.

2. **Criminal Law § 106— motion for nonsuit — sufficiency of the evidence — question of law**

   To withstand defendant's motion for judgment as of nonsuit, there must be substantial evidence against the accused of every essential element of the crime charged; whether the State has offered such substantial evidence presents a question of law for the court.

APPEAL by defendant from *Long, J.,* January 25, 1971 Session of MOORE Superior Court, transferred for initial appellate review by the Supreme Court under its general order of July 31, 1970, entered pursuant to G.S. 7A-31(b)(4).

Defendant was indicted, in the form prescribed by G.S. 15-144, for the murder of Thomas Steven Brown on October 19, 1969.

When the case was called for trial, the solicitor announced that the State would not seek a verdict of guilty of murder in the first degree but would ask for a verdict of guilty of murder in the second degree "or a lesser included offense."

The only evidence was that offered by the State. It consisted of stipulations; a report dated August 12, 1970, by E. B. Pearce, Special Agent of the State Bureau of Investigation; and of the testimony of the following witnesses: Jack Elkins (Elkins); Darrell McNeill (McNeill); Jerry Deaton (Deaton); James Bibey (Bibey); June Brown, father of Thomas Steven Brown (Tommy), deceased; and Deputy Sheriff Coy Warf (Warf).

Deputy Sheriff Warf arrived at the scene of the homicide at approximately 1:15 a.m. on Sunday, October 19, 1969.

Tommy's body was lying in front of the filling station-grocery store at Robbins Crossroads, the intersection of N. C. Highways Nos. 705 and 27. The area in front of the building was completely paved and extended approximately 50 feet from the building to the highway. Pumps were in this area, being approximately 10-12 feet from the building. Tommy's car was parked next to the pumps on the side toward the highway and his body was beside his car, also on the side toward the highway.

A .22 pistol was found under Tommy's body. The cylinder of this pistol held nine cartridges. At that time it contained "three spent cartridges" and "six rounds that hadn't been fired." "(A) half-box of bullets" was found in Tommy's car.

It was stipulated that Tommy died "as a result of a gunshot wound received by him" on October 19, 1969. The bullet removed from Tommy's body was fired by a ".25 automatic."

Tommy, 21, was "a little over five feet tall" and weighed 138 pounds. June Brown, Tommy's father, testified that defendant was "twice bigger than (his) son." June Brown also testified that he had known defendant "roughly eight or ten years"; that they had visited in each other's homes; that Tommy and defendant were good friends; that both were horsemen and frequently rode together; and that he had never heard of any quarrel or animosity between them.

June Brown testified to a conversation with defendant "about a month and a half" before Tommy's death in which defendant stated that he had bought a .25 automatic "blue steel" pistol. He also testified that defendant had a red and white Ford pickup truck.

On Saturday night, October 18, 1969, there was a dance in West End, some 15 miles from Robbins Crossroads.

McNeill's testimony includes the following: He and his wife, Carolyn, and another couple, Tommy and Pat Williamson, had been riding around. They had parked for 35 or 40 minutes near the dance hall at West End. When they got ready to leave, Tommy, who had been sitting in the McNeill car, got out and started toward his own car. As the McNeill car was starting to drive off, "some boys in a red and white Ford pickup told him (Tommy) he was chicken, to come to Robbins Crossroads." Williamson drove the McNeill car to Robbins

Crossroads and pulled up beside Tommy's car. An unidentified "boy" came up and talked to Williamson, "using a lot of language." When McNeill told him "to hold it down," the boy walked around the car, stuck his head in the window and pulled a knife on McNeill and put it to his throat. He put the knife down when Tommy told him to leave McNeill alone, that McNeill "was a friend of his." As directed by McNeill, Williamson drove to the police station in Robbins, some two miles away. There "wasn't any law there." McNeill told the "six or seven boys" who were there "about it" and these boys and the McNeill party went from Robbins to Robbins Crossroads. The McNeill party had been gone from Robbins Crossroads twenty to thirty minutes. Upon returning, the McNeill car pulled up beside Tommy's car. Tommy was sitting in his car, alone. A police car was parked across the road. After the police car drove off, "some more shots fired" but McNeill could not determine "where these shots came from."

Elkins, McNeill, Deaton and Bibey testified to events at Robbins Crossroads *when Tommy was shot.* Each testified in substance as narrated below.

Elkins version: He is 24 and lives in Robbins. He was Tommy's good friend and rode with him to their place of work in Siler City. A "boy" from Carthage was taking him to his home in Robbins. When he saw Tommy's car at Robbins Crossroads, he said he would get out and ride with Tommy to Robbins. As he started toward Tommy's car, three Allred boys, with whom he had had trouble, approached him in a hostile and abusive manner. Tommy was sitting under the steering wheel of his car and was loading his .22 pistol. Elkins asked Tommy for his gun and then "got it out of his hand." He went to the back of Tommy's car. The three Allred boys were coming toward him. He shot three times into the ground in front of them. They ran. After he had fired the three shots, Tommy got out of the car, came back to where he was standing, and said, "Jack, give me my gun back, I don't want no trouble," or something like that. He gave it to Tommy. When Tommy got his gun back, defendant, whom Elkins had not seen, grabbed him by his coat. Defendant had "a small handgun" in his right hand which he stuck in his (Elkin's) face. The gun "wasn't very long." He did not recall whether it was chrome-plated, "what color it was or anything about it." When he saw the gun, "it scared (him) so bad (he) just gave a big jerk" and left

defendant holding his coat. He ran through a person's yard and through a honeysuckle thicket. The three Allred boys came after him and started hitting him. One of them had a knife. He had not seen defendant earlier that evening anywhere. Nor had he had any prior difficulty with him. Nor did he see any conversation or difficulty between Tommy Brown and defendant. He heard no shooting other than the three shots he fired. When these events occurred, there "were several cars out in the yard to this store . . . more than three or four." Also, there "were right many people out in the yard of the store." He had heard that Tommy Brown and defendant were good friends. The three Allred boys who had attacked Elkins were Donald, David (Corky) and Tony.

McNeill version: Upon returning to Robbins Crossroads, McNeill told Tommy to come over and get into the McNeill car so they could leave. Tommy said, "Wait just a minute, let me reload my gun." Tommy reloaded his gun, got out of his car and walked to the front. At that time, "there was shooting," two or three shots. There were "four or five other people there at the front of Tommy Brown's car." One was a "little bitty boy" who had a pistol. McNeill's attention was diverted because he "was having trouble with (his) wife." When he next observed Tommy, Tommy and "a heavy-set fellow" came by the McNeill car, "wrestling." As they passed, McNeill observed a pistol in Tommy's hand. He observed no weapon in the hand of the "other person." After they had passed alongside of McNeill's car, McNeill heard three or four shots but could not tell whether they came from the front or back. Shortly thereafter the "other person" came back by McNeill's car. At that time, he had "a little short gun" in his hand. He proceeded to a red and white pickup truck, which was "35 to 50 feet in front" of the McNeill car. He and two or three others got into the pickup and rode away. McNeill went to the back of his car. Tommy was lying there. His pulse was not beating. When McNeill returned from Robbins, "around ten or fifteen" were there at Robbins Crossroads. "(O)ff and on," eight or ten shots were fired. McNeill could not swear to whether the "big man" who came alongside his car, scuffling with Tommy, was a person then in the courtroom.

Deaton version: He saw Tommy in the McNeill car at West End. He drove, alone, from West End, saw Tommy's car at Robbins Crossroads and stopped, parking close to and to the

rear of Tommy's car and headed toward the pumps. McNeill's white Oldsmobile was there; also, defendant's red and white Ford pickup. The pickup was about 40 feet from Tommy's car. He thought it was "between the gas pumps and the store." He did not know "any trouble (was) going on." He did not see Elkins. When he got out and walked by McNeill's car, McNeill was mad and asked to borrow his knife. He refused, seeing "there was trouble." He first saw Tommy when he and others were together "just beside the gas tanks." Defendant was in this group. He saw no fighting at that time. Soon thereafter he saw Tommy and defendant fighting. There "weren't much of a fight to it." Defendant had Tommy by the hair of his head and hit him "one or two times," knocking him "this way and this way" until Tommy fell. He (Deaton) was about ten feet from Tommy. Tommy "was unconscious or dead." He started toward Tommy to see "how bad he was hurt." When he heard somebody say Tommy had been shot, he went to his car "to go get the ambulance." The only gun he saw was "a nickel-plated, short gun, four or five inches long, and Tommy had it." "(T)wo boys" asked Tommy for the gun but he "wouldn't give it to them." He "heard them say, '(a)t least unload it.'" Earlier in the night, he (Deaton) heard "three shots," "way over to the left," but did not know where they came from. He did not see defendant fire a shot or have a gun at any time that night. When defendant was holding him, Tommy was standing up straight. When defendant hit Tommy, defendant said: "S.O.B., you hear me now."

Bibey version: He drove from Carthage to Robbins Crossroads. Elkins rode with him. Upon his arrival at Robbins Crossroads, "five or six cars" were there and probably "twelve or thirteen or fourteen people." He knew "a few of them" when he saw them but not "by name." He parked approximately 15 or 20 feet away from Tommy's car. Elkins got out of Bibey's car and went over to see if Tommy would carry him home. Elkins was talking with Tommy, standing at the door of his car, when he heard "the Allred boy" curse Elkins and also heard some discussion about getting a gun out of Tommy's car. Elkins did get the gun, and "was running the Allred boys around . . . . shooting at them or at the ground. . . . " He did not know "what Allred boys these were." At that time, defendant "was standing and backing away from the trouble." He was "quite a ways from Brown." As the Allred boy(s) ran "in

the darkness," Elkins ran over to the corner of the service station. Then Tommy came over from his car to Elkins as if to retrieve the gun, saying something about "give me the gun before someone gets hurt." Elkins did not give it to him. Then Elkins, Tommy and defendant "came together as if to retrieve the gun." Previously, three shots had been fired by Elkins. A fourth shot was fired about the time Elkins, Tommy and defendant were scuffling. Bibey did not know who fired the fourth shot. It sounded like the others. Tommy broke away from the scuffling, stepped back, walked around and leaned up against a white Oldsmobile. When the Oldsmobile started to pull off, Tommy "tumbled over on the ground." Elkins also broke away from defendant and ran. After the white Oldsmobile backed away, Tommy was lying on his back. Defendant came over to him and got "kindly on his knees" in front of Tommy. He seemed to be striking him. He was threatening to kill him, saying, "goddamn you, I'll kill you, you believe that, I'll kill you." Bibey was then backing his car around and did not know what defendant did thereafter.

Tommy was killed near midnight. The filling station-store was closed for the night. Elkins, McNeill, Deaton and Bibey differ in respect of the exact time each of them arrived at Robbins Crossroads and in respect of the extent the area was lighted.

The jury returned a verdict of guilty of manslaughter and the court pronounced judgment which imposed a prison sentence of not less than eight nor more than ten years.

*Attorney General Morgan and Assistant Attorneys General Briley and Wood for the State.*

*Dock G. Smith, Jr., and Pittman, Staton & Betts, by William W. Staton for defendant appellant.*

BOBBITT, Chief Justice.

[1] Defendant assigns as error the denial of his motion under G.S. 15-173 for judgment as of nonsuit. Decision requires consideration of the evidence in the light most favorable to the State. *State v. Vincent,* 278 N.C. 63, 64-65, 178 S.E. 2d 608, 609 (1971), and cases cited.

The evidence is uncontradicted as to this crucial fact: The death of Tommy at Robbins Crossroads on October 19,

1969, was caused by a .25 bullet fired from a .25 automatic pistol.

There is no testimony that defendant had a .25 automatic pistol at Robbins Crossroads on October 19, 1969. Nor is there testimony that defendant fired any pistol on that occasion. The State relies upon circumstantial evidence.

[2] To withstand defendant's motion for judgment as of non-suit, there must be substantial evidence against the accused of every essential element that goes to make up the crime charged. Whether the State has offered such substantial evidence presents a question of law for the court. State v. Stephens, 244 N.C. 380, 383-384, 93 S.E. 2d 431, 433 (1956); State v. Horton, 275 N.C. 651, 657, 170 S.E. 2d 466, 471 (1969). In the present case, the crucial question is whether the State offered substantial evidence that the fatal shot was fired by defendant.

[1] The only evidence which purports to connect defendant with a .25 pistol is the testimony of Tommy's father to the effect that defendant had told him, "about a month and a half" before Tommy's death, that he (defendant) had bought a .25 automatic pistol, "blue steel." There is no evidence such a pistol was seen in defendant's possession at any time before or after Tommy's death.

An attempt to reconcile the conflicting testimony would be futile. Each version differs sharply from the other, particularly on the issues of whether defendant had "a gun" and, if so, what he did with it.

According to Elkins: After he fired the three shots into the ground in front of the Allred boys, Donald, Corky and Tony, and after Tommy got out of his car and called for his pistol, defendant grabbed him (Elkins) and stuck a "small handgun" in his face. He did not know what color it was or anything about it. He heard no shot other than the three shots he (Elkins) fired.

According to McNeill: A "heavy-set fellow" and Tommy scuffled as they went to the back of McNeill's car, a white Oldsmobile. When the "heavy-set fellow" returned, he had "a little short gun" in his hand. McNeill could not identify any person in the courtroom as the "heavy-set fellow."

State v. Allred

According to Deaton: Although he saw defendant grab Tommy by the hair of his head and knock him down, the only gun he saw was the gun Tommy had, "a nickel-plated, short gun, four or five inches long." He did not see defendant fire or have a gun.

According to Bibey: After Elkins had fired three shots from Tommy's gun, Tommy, Elkins and defendant came together "to retrieve" Tommy's gun. Meanwhile, a fourth shot was fired. Tommy broke away from the scuffling and leaned against a white Oldsmobile. The white Oldsmobile started away and Tommy fell. The only gun referred to by Bibey is Tommy's .22 pistol which Elkins had fired.

There is evidence which indicates hostility between Tommy and Elkins (and perhaps others) on the one hand and Donald, Corky and Tony Allred (and perhaps others) on the other hand. There was evidence from which it may be inferred that the three Allreds who were hostile to Tommy and Elkins were being transported on October 18, 1969, in defendant's red and white pickup truck, and that occupants of that truck challenged Tommy to come to Robbins Crossroads. There was evidence that Tommy was equipped with a loaded pistol and additional bullets. There was evidence that Tommy and defendant were good friends and evidence from which it may be inferred that defendant intervened to keep Tommy from inflicting injury or death by use of his .22 pistol.

There was positive evidence that at least one unidentified person, a "little bitty boy," had a pistol. Evidence as to the number of persons present and the number of shots fired at Robbins Crossroads during a period of hostility and confusion suggests that other unidentified persons had pistols.

The threatening language attributed to defendant by Deaton and Bibey related only to what defendant *would do in the future*.

It is well established that "(c)ontradictions and discrepancies, even in the state's evidence, are for the jury to resolve, and do not warrant nonsuit." 2 Strong, N. C. Index 2d, *Criminal Law* §104. Ordinarily, such contradictions and discrepancies bear solely upon the weight to be given the testimony of a witness, a matter within the province of the jury. *State v. Satterfield*, 207 N.C. 118, 176 S.E. 466 (1934).

Here the question is whether the State has offered substantial evidence that the fatal shot was fired by defendant. The evidence on which the State relies to establish this crucial fact involves more than mere contradictions and discrepancies. The testimony of McNeill, Deaton and Bibey relate to three separate and distinct occasions, each involving different circumstances immediately preceding Tommy's death. The version on which the State relies is not disclosed. The court's charge does not review any contention of the State with reference to the occasion and circumstances of Tommy's death.

Although the evidence raises *suspicions* as to defendant's involvement and possible guilt in respect of the death of Tommy, the conclusion we reach is that the State has failed to offer substantial evidence that the bullet which caused Tommy's death was from a *.25 automatic pistol fired by defendant*. On account of the inadequacy of the evidence in respect of this essential element of the crime charged, we hold the circumstantial evidence insufficient for submission to the jury. For error in failing to allow defendant's motion for judgment as of nonsuit, the judgment of the court below is reversed.

Reversed.