STATE OF NORTH CAROLINA v. BRYAN BOARD

No. 95

(Filed 16 March 1979)

**Narcotics § 4.1— possession and sale of 3, 4-methylenedioxyamphetamine charged —proof of possession and sale of MDA—entrapment—conviction reversed**

Conviction of defendant for possession, possession with intent to sell, and sale of MDA is reversed, three judges being of the opinion that nonsuit should have been granted because defendant was charged with possession with intent to sell and sale of 3, 4-methylenedioxyamphetamine but there was no evidence that 3, 4-methylenedioxyamphetamine and MDA were the same thing, and three judges being of the opinion that the conviction should be reversed under *S. v. Stanley*, 288 N.C. 19, because the evidence showed entrapment as a matter of law.

Justice BRANCH concurring.

Justices COPELAND and BRITT join in the concurring opinion.

Justice BROCK dissenting.

ON defendant's petition for discretionary review of decision of the Court of Appeals, 37 N.C. App. 581, 246 S.E. 2d 581 (1978),

upholding judgment of *Judge Collier* entered at the 17 October 1977 Session of ROWAN Superior Court. This case was docketed and argued as No. 120 at the Fall Term 1978.

Defendant was charged in four separate bills of indictment, proper in form, with the following crimes: (1) Possession with intent to sell, 3, 4-methylenedioxyamphetamine, a Schedule I controlled substance, on 8 February 1975; (2) sale of 3, 4-methylenedioxyamphetamine to SBI Agent J. R. Adcox on 8 February 1975; (3) possession with intent to sell 3, 4-methylenedioxyamphetamine on 14 February 1975; and (4) sale of 3, 4-methylenedioxyamphetamine to SBI Agent J. R. Adcox on 14 February 1975.

The State's principal witnesses were Earnest F. Casey, Jr., and J. R. Adcox. Casey testified that he was twenty years of age and a long-time friend of defendant who was a junior in high school and seventeen years of age. Both Casey and defendant attended the First Baptist Church of China Grove in Rowan County. Defendant and his family were active members of the church, and Casey was the coach of the church basketball team on which defendant played.

In January 1975 Casey was trying to start a career in law enforcement and agreed to work as an undercover agent for the SBI under the supervision of J. R. Adcox, a special agent. After accepting such role, he went around the China Grove area talking with different people to find out if there was any drug traffic in that area. Defendant stated on Casey's first inquiry that he did not know where any drugs could be obtained. Casey went to defendant a second time and told him a man from Charlotte was trying to make contacts in Rowan County to purchase drugs; that while he, Casey, was in the Air Force he had been into drugs in Mississippi and was able to get a lot of high-grade marijuana (a statement which Casey admitted was untrue). Casey visited in the home of defendant several times and asked defendant in the presence of his parents to join a scout troop which was being organized. He also saw defendant in Sunday school and at basketball practice and made many inquiries concerning the purchase of drugs.

On 7 February 1975 Casey told defendant a man from Charlotte named Jim "was going to come down and was going to make some contacts with people down here"; that "Jim was into

drugs in Charlotte"; that he wanted to introduce him to Jim. The introduction took place in the Methodist Church parking lot in China Grove about 8 p.m. that evening. At that meeting "Jim" (who was SBI Agent J. R. Adcox) gave defendant $50 with which to purchase "MDA." They agreed to meet later that night for delivery of the "MDA," but the meeting never took place because Casey was stopped by the local police and given a traffic ticket. The following morning Casey talked with defendant and arranged for Casey and "Jim" to meet defendant at his home that afternoon. When they arrived at the house, Casey entered and went to defendant's room where defendant showed him a white "baggy" with a white powdery substance in it (State's Exhibit 1). Casey told him to carry it out to Adcox who had remained in the car, and defendant did so. This transaction gives rise to charges (1) and (2).

The next day, 9 February 1975, Casey talked with defendant at church and asked him "if he knew where he could get any more drugs. He said that he would do what he could. And so, on the 14th he did obtain some for me. I was the one that asked him if he knew where he could get anything like that, but he did turn it over to Agent Adcox. The 14th was the next time that Mr. Board brought drugs to Agent Adcox."

J. R. Adcox testified that he was a special agent with the State Bureau of Investigation; that on the afternoon of 8 February 1975 defendant gave him the "baggy" which contained three quarters of a gram of "MDA" and returned $15 in change, saying he had been unable to purchase a full gram. They discussed drugs generally for a few minutes, and Agent Adcox told defendant he would purchase a gram of "crystal." He gave defendant $25 and they agreed to meet again at approximately 9:30 p.m. at the China Grove Junior High School at which time Adcox was to pay an additional $25—making a total of $50—for the gram of crystal.

Later that evening defendant left word to meet him at the King of Pizza in Kannapolis, and the parties met there around 9 p.m. The defendant, with three friends, approached Casey's car and defendant handed Adcox another "baggy." They discussed the price and Adcox finally gave defendant $10, making a total price of $35. Subsequent analysis of the contents in this "baggy" revealed that it was not a controlled substance.

Thereafter, on Friday, 14 February 1975, Casey called defendant to inquire about buying another gram of "MDA." Adcox and Casey met defendant about 4 p.m. in the A & P parking lot and, as they drove around together, defendant said "here you go, Jim" and handed Adcox a small clear plastic bag containing a powder (State's Exhibit 2). This transaction is the basis for indictments (3) and (4). Adcox commented that he was disappointed about the previous purchase made at the King of Pizza because it was not a drug. Defendant said he was sorry and told Adcox he could taste the substance defendant had just handed to him. Adcox then gave defendant $45 and asked if that particular "MDA" came from the Moores, and defendant replied he got it from "the little Moore— that Ricky was not at home and the little Moore appeared to have been left in charge."

Defendant testified in his own behalf. His evidence tends to show that defendant was in the twelfth grade, had known Earnest Casey most of his life, went to school and to church with him, and played on a church basketball team which Casey coached. In early 1975 defendant saw Casey two or three nights a week. One night "all of a sudden" Casey started asking where he could get some drugs and continued to ask that question every time they were together. Defendant repeatedly stated he did not know where drugs could be obtained. Eventually Casey said he was working at the bank and they were going to have a bank party and he needed some drugs. Defendant said he would ask people at school where drugs could be obtained. Casey said he had a friend named Jim who worked at the bank with him and that Jim was coming down one night to get the drugs and Casey wanted defendant to meet Jim. As a result of his inquiries, defendant learned where he could get some drugs, so informed Casey, and they agreed to meet at the parking lot of the First Methodist Church. They met that night and Jim was introduced by Casey as "a friend of mine that works at the bank." Jim said he would like to buy some drugs and gave defendant $50 with which to purchase them. Defendant testified he then went to the Moores and bought drugs, and the next day Casey and "Jim" came to his home. Casey came to the bedroom and defendant, as directed, took the drug outside and gave it to "Jim" together with $15 in change. Jim thereupon returned the $15 plus an additional $10 with which to buy more drugs. Defendant went back to the Moores' house

but they didn't have any and referred him to a girl. Defendant said he bought what he thought was a drug from the girl and later delivered it to Jim at the pizza place.

Between February 8 and 14 defendant said Casey called practically every day wanting more drugs "for the coming weekend." During that period Casey brought an Explorer Scout Troop application blank to defendant's home, said they were starting a new post and wanted defendant to join it.

On 14 February defendant met Casey and "Jim" in the A & P parking lot as prearranged, got in their car and gave Jim what he had previously bought for him. Defendant testified that he did all these things because Casey wanted him to and he was doing it for Casey as a friend. That afternoon as they rode around Casey and Jim wanted more drugs and defendant agreed to take them to a trailer where they could get some. When they got there defendant recognized cars belonging to people he did not want to associate with and refused to go in.

Defendant further testified that Casey smoked marijuana with defendant and another fellow one night after a basketball game, talked about his days in the Air Force in Mississippi when he was on drugs, continuously encouraged drugs and never said there was anything wrong with using them. Finally, Casey's insistence that defendant get more and more drugs for him became so bothersome that defendant refused to take telephone calls from Casey and refused to get any more drugs for him.

Defendant testified that he did not make any profit from any of the transactions with Jim and Casey, always returning the difference between what he paid for the drugs and the sum they had given him. And there is no evidence to the contrary.

The testimony of defendant's father and mother tends to corroborate defendant's testimony.

On cross-examination both defendant and his father testified they had heard of the case of *State v. Stanley* (288 N.C. 19, 215 S.E. 2d 589 (1975)). Defendant said he hadn't read it but had "seen it and heard Mr. Davis talk about it." Defendant further admitted on cross-examination that he had been convicted of simple possession of marijuana in December 1976 while this case was on appeal to the Court of Appeals.

The jury rendered the following verdict: In case (1)—guilty of simple possession of "MDA" on 8 February 1975; in case (2)—not guilty of the sale of "MDA" on 8 February 1975; in case (3)—guilty of possession of "MDA" with intent to sell on 14 February 1975; and in case (4)—guilty as charged of sale of "MDA" on 14 February 1975. Defendant appealed from a consolidated judgment imposing imprisonment for a maximum term of eighteen months as a committed youthful offender. The Court of Appeals found no error, and we allowed defendant's petition for discretionary review.

*Rufus L. Edmisten, Attorney General, by James Peeler Smith, Assistant Attorney General, for the State.*

*Robert M. Davis, for defendant appellant.*

HUSKINS, Justice.

Since we dispose of the case on other grounds, the question of entrapment, vigorously debated in the briefs, is not reached.

For reasons which follow, we hold that defendant's motion for judgment of nonsuit at the close of all the evidence should have been allowed.

To withstand a motion for nonsuit there must be substantial evidence against the accused of all material elements of the offense. *State v. Lee*, 294 N.C. 299, 240 S.E. 2d 449 (1978), and cases cited therein; *State v. Allred*, 279 N.C. 398, 183 S.E. 2d 553 (1971), and cases cited therein. Evidence which is sufficient only to raise a suspicion or conjecture of guilt is insufficient to withstand nonsuit. *State v. Lee, supra; State v. McKinney*, 288 N.C. 113, 215 S.E. 2d 578 (1975).

Defendant was tried upon four separate bills of indictment charging him with possession with intent to sell and selling, on two separate occasions, 3, 4-methylenedioxyamphetamine, a Schedule I controlled substance. *See* G.S. 90-89(c)1. A material element common to the offenses charged is the *identity of the substance* possessed and sold by defendant. In the present case the crucial question is whether the State offered substantial evidence that the drug possessed and sold by defendant was 3, 4-methylenedioxyamphetamine.

The only proof that the drug possessed and distributed by defendant was 3, 4-methylenedioxyamphetamine, as charged, is found in the cross-examination of J. R. Adcox, Special Agent, as follows: "Two of the three substances that I purchased from Mr. Board were MDA. The third was not a controlled substance." This testimony tends to show that Adcox purchased "MDA," a "controlled substance," from defendant. This testimony, however, does not constitute substantial evidence that the drug possessed and sold by defendant was in fact 3, 4-methylenedioxyamphetamine as charged in the bills of indictment.

Schedule I controlled substances include those listed in G.S. 90-89 "by whatever official name, common or usual name, chemical name, or trade name *designated*." (Emphasis added.) At all times pertinent to this case that list embraced forty-three substances enumerated in G.S. 90-89(a), twenty-three additional substances enumerated in subsection (b), and eighteen additional substances enumerated in subsection (c). The designation "MDA" nowhere appears in Schedule I or any of the other schedules of controlled substances. *See* G.S. 90-89 through 90-94. The significance of the designation "MDA" is thus left to conjecture and the jury is left to speculate whether "MDA" refers to the controlled substance named in the bills of indictment.

Is "MDA" an abbreviation, common or usual name, chemical name, trade name or even the "street" name for the drug 3, 4-methylenedioxyamphetamine? The witnesses do not say. The record tends to show that the white powdery substances purchased from defendant on February 8 and February 14, 1975 (State's Exhibits 1 and 2) were mailed to the Chemical Laboratory of the State Bureau of Investigation for analysis and were duly returned. The exhibits were then turned over to the Clerk of Superior Court of Rowan County and were offered in evidence at trial. For reasons not readily apparent the chemical analysis was never offered in evidence. Did the analysis show that the substances possessed and sold by defendant were 3, 4-methylenedioxyamphetamine? The record provides no answer.

In *State v. McKinney*, supra, we stressed that identification of a controlled substance by an abbreviation not designated by the schedules of controlled substances does not constitute substantial evidence that the substance distributed by defendant was the controlled substance alleged in the indictments. McKin-

ney was indicted for the felonious sale and distribution of tetrahy-drocannabinols, a controlled substance included in Schedule VI of the North Carolina Controlled Substances Act. *See* G.S. 90-94. The State's evidence tended to show that defendant distributed a substance identified as "THC, a substance similar to marijuana like drugs." The abbreviation THC was not used in Schedule VI. The State never established whether THC was an abbreviation for tetrahydrocannabinols. We concluded that the State's evidence was insufficient to establish that the substance distributed by defendant was in fact tetrahydrocannabinols. *Held*: Defendant's motion for nonsuit should have been granted.

To withstand a motion for judgment as of nonsuit there must be substantial evidence of all material elements of the offense charged, and whether the State has offered such evidence is a question of law for the trial court. *State v. Everette*, 284 N.C. 81, 199 S.E. 2d 462 (1973); *State v. Evans*, 279 N.C. 447, 183 S.E. 2d 540 (1971); *State v. Allred, supra*. Here, the State has failed to of-fer substantial evidence that the substance distributed by defend-ant was in fact 3, 4-methylenedioxyamphetamine, as charged in the bills of indictment. This failure requires dismissal. *State v. McKinney, supra; State v. Bass*, 253 N.C. 318, 116 S.E. 2d 772 (1960); *State v. Edwards*, 224 N.C. 577, 31 S.E. 2d 762 (1944).

For the reasons stated the decision of the Court of Appeals is reversed. The case is remanded to that court for further remand to the Superior Court of Rowan County for entry of judgment dismissing the charges in accordance with this opinion.

Reversed and remanded.

Justice BRANCH concurring.

For the reasons stated in *State v. Stanley*, 288 N.C. 19, 215 S.E. 2d 589 (1975), I concur in result.

Justices COPELAND and BRITT join in this concurring opinion.

Justice BROCK dissenting.

The majority dismisses these charges against the defendant because no witness testified that MDA was in fact an abbrevia-tion for 3, 4-methylenedioxyamphetamine. The majority then

reasons that testimony that defendant possessed and delivered MDA "does not constitute substantial evidence that the drug possessed and sold by defendant was in fact 3, 4-methylenedioxyamphetamine as charged in the bills of indictment."

I disagree with the majority opinion for what I consider to be two substantial reasons.

First: The Courts are not required nor expected to be more blind than other segments of society to facts which are commonly known or to facts which are readily verifiable. "Many facts . . . are so indisputable, and so generally known or so readily verifiable that it would be a waste of time and a perversion of the judicial function to require them to be proved. A court will take *judicial notice* of facts of this character, *i.e.*, it will assume or declare them to exist without requiring the production of evidence to establish them." 1 Stansbury's North Carolina Evidence, Judicial Notice, § 11, p. 24 (Brandis Rev. 1973). *Drug Laws of North Carolina (Including Regulations)* issued by North Carolina Drug Authority (now North Carolina Drug Commission) sets out on page 121 the Common or Trade Name for the Statutory or Legal name of Schedule 1 Controlled Substances. MDA is listed as the Common or Trade Name for 3, 4-methylenedioxyamphetamine. This source is readily available and the abbreviation is readily verifiable. The trial judge took judicial notice of this fact when he instructed the jury as follows:

"Now, the defendant in these cases has been accused of possession of methylenedioxyamphetamine, a controlled substance, with the intent to sell it, and sale of this same controlled substance. Now, for the purposes of clarification, I will refer to that alleged substance by the term, MDA, which is the common way that it is referred to. It is the common abbreviation for the controlled substance, methylenedioxyamphetamine. In these instructions, when I use the abbreviations MDA, you will know that that is the alleged substance to which I refer."

The State's witnesses, the district attorney, counsel for defendant, and the defendant himself referred to the drug as MDA. No objection or exception was taken by the defendant to the trial judge's taking notice, and instructing the jury, that MDA was the common abbreviation for 3, 4-methylenedioxyamphet-

amine. If defendant had objected, I think it would have been without merit. But the point is that defendant himself is satisfied with the trial judge's action in this regard. For this Court to say the evidence of defendant's possession and delivery of MDA does not constitute substantial evidence that the drug possessed and sold by defendant was in fact 3, 4-methylenedioxyamphetamine is tantamount to saying that the trial judge abused his discretion in judicially noticing this fact. In my opinion the trial judge was correct.

Second: The primary argument of defendant, both in the Court of Appeals and in this Court, is that the evidence establishes entrapment as a matter of law. At no point does defendant argue that the evidence that he possessed and delivered MDA does not constitute substantial evidence that he sold and delivered 3, 4-methylenedioxyamphetamine as charged in the bills of indictment. He, in effect, took notice of that fact himself.