STATE OF NORTH CAROLINA v. GEORGE JUNIOR HAYDEN

No. COA10-1306

(Filed 7 June 2011)

## 1. Homicide— first-degree murder—motive to kill—evidence sufficient

Taking the evidence in the light most favorable to the State, there was sufficient evidence in a first-degree murder prosecution for a rational juror to find the existence of a motive to kill the victim where there was evidence of hostility between the victim and defendant that erupted at times into physical violence and threats.

## 2. Homicide— first-degree murder—opportunity to kill—evidence not sufficient

In a first-degree murder prosecution, the State did not present sufficient evidence of defendant's opportunity to kill the victim where the only evidence was a statement made 26 years after the murder that defendant was located two miles away. There was no evidence placing defendant at the scene of the crime, much less at the scene when the crime was committed.

## 3. Homicide— first-degree murder—means to kill—evidence not sufficient

The State did not present sufficient evidence that defendant had the means to kill a first-degree murder victim where the State could only establish that a high velocity rifle that might have been an M16 could have fired bullets associated with shell casings found at the scene, but could not establish that an M16 actually fired that type of shell casing, that defendant had an M16, or how defendant could have obtained one other than his boasts and vague testimony that such a theft might have been possible.

Appeal by defendant from judgment entered 26 May 2010 by Judge Kenneth F. Crow in Onslow County Superior Court. Heard in the Court of Appeals 11 April 2011.

*Attorney General Roy Cooper, by Assistant Attorney General Amy Kunstling Irene, for the State.*

*Marilyn G. Ozer for defendant.*

Elmore, Judge.

George Junior Hayden (defendant) appeals from a judgment entered pursuant to a jury verdict of guilty on a charge of first degree murder in the shooting death of William Miller (Bill or the victim). After careful review, we reverse.

## I. Facts

On 16 September 1972, four men driving on Western Boulevard in Onslow County found the body of the victim on the side of the road in a wooded area, his car stopped in the road. The driver noted that the car was running; its door was open; and its headlights and tail lights were on. The victim was lying in the road in front of the car with blood on the ground around him and a clear gunshot wound to the head. A still-smoldering cigarette was at his feet, and a handgun was on the front seat of the car. The men called the Sheriff's Department to report the incident; that call was received at 10:25pm.

Defendant was questioned during the investigation immediately following the murder, but never charged. In 2009, defendant was indicted for first degree murder; he was found guilty by a jury on 26 May 2010 and sentenced to life imprisonment.

Defendant and the victim knew each other because defendant had moved in with the victim's wife, Vickie Miller, while defendant, a member of the Marine Corps, had been stationed in Okinawa during the year prior to his death. The victim returned home from this tour shortly before his death.

At trial, the jurors heard testimony from, among others, Robert Fitta, a neighbor of the Millers'; Rodger Gill, an acquaintance of the victim's; and a myriad of investigators who had dealt with the case since 1972.

In total, defendant made three statements to investigators: one on 17 September 1972 (the 1972 statement), one on 23 January 1973 (the 1973 statement), and one on 6 July 1998 (the 1998 statement). The statements made by defendant therein were introduced at trial via the testimony of the investigating officers who took the statements from defendant, as were statements made by other persons who did not testify at trial. More details regarding the facts are provided below as they are germane to defendant's arguments on appeal.

## II. Motion to Dismiss

Defendant's first argument is that the trial court erred by denying his motion to dismiss the murder charge based on insufficient evi-

dence that defendant was the perpetrator. More specifically, defendant argues that the State's evidence of defendant's motive, means, and opportunity raised no more than a suspicion that defendant was the perpetrator of the crime. We agree.

The standard of review of a trial court's denial of a motion to dismiss is *de novo*. *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). In evaluating a defendant's argument, this Court will consider whether "there is substantial evidence (1) of each essential element of the offense charged . . . and (2) of defendant's being the perpetrator of such offense." *State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002). Substantial evidence is "that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2002). The Court considers the evidence taken as a whole when considering its sufficiency. *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978). Furthermore, the evidence should be viewed "in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992).

Circumstantial evidence may be sufficient to overcome a motion to dismiss "even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). If a reasonable inference of defendant's guilt may be made, then "it is for the jury to decide whether the facts, taken singly or in combination, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty." *Thomas*, 296 N.C. at 244, 250 S.E.2d at 209 (quotations and citation omitted); *see also, e.g., State v. Brooks*, 2008 N.C. App. LEXIS 392, *11-12 (holding that, although the State did not present evidence directly contradicting the defendant's story that he had shot his son in the top of the head in self-defense, the State did present evidence contradicting the story sufficient to support the denial of his motion to dismiss the charge of first degree murder, including evidence that he "put his son's body, along with his son's dog and material possessions, into a garbage pit on his property" and waited two weeks to inform anyone of the death). However, where the evidence is "sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it," the motion to dismiss should be allowed. *Scott*, 356 N.C. at 595, 573 S.E.2d at 868.

III. Evidence of defendant's motive, opportunity, and means to commit the crime to support defendant's identity as the perpetrator of the crime.

**[1]** In the case *sub judice*, the State presented only circumstantial evidence of defendant's identity as the perpetrator.

> When the evidence establishing the defendant as the perpetrator of the crime is circumstantial, "courts often [look to] proof of motive, opportunity, capability and identity" to determine whether a reasonable inference of defendant's guilt may be inferred or whether there is merely a suspicion that the defendant is the perpetrator.

*State v. Pastuer*, —— N.C. App. ——, ——, 697 S.E.2d 381, 385 (quoting *State v. Bell*, 65 N.C. App. 234, 238, 309 S.E.2d 464, 467 (1983)) (alteration in original), *disc. rev. granted*, —— N.C. ——, 705 S.E.2d 381 (2010). As we noted in *Bell*, "courts often speak in terms of proof of motive, opportunity, capability and identity, all of which are merely different ways to show that a particular person committed a particular crime. . . . [These] are circumstances which are relevant to identify an accused as the perpetrator of a crime." *Bell*, 65 N.C. App. at 238, 309 S.E.2d at 467. "[E]vidence of either motive or opportunity alone is insufficient to carry a case to the jury." *Id.*, 65 N.C. App. at 238-39, 309 S.E.2d at 467.

A. Evidence of defendant's motive to kill the victim.

Defendant argues that the State's evidence of motive was insufficient to overcome his motion to dismiss. Evidence presented by the State tending to prove motive included the following:

1. Defendant's 1972 statement to investigators that he lived with Vickie Miller, the victim's wife, while the victim was serving in the military overseas.

2. Testimony from Rodger Gill, an acquaintance of the victim and defendant, that defendant made "some offhanded comments . . . that, you know, if [the victim] did anything to them, [defendant] would get him."

3. Testimony from a neighbor that she observed the victim and defendant get into a physical altercation after the victim returned from overseas. After the fight, Vickie, the victim's daughter, and defendant left and began living together elsewhere.

4. Testimony from the victim's sister that the victim called her after the fight and told her that the victim "beat the shit out of" the defendant and that defendant "threatened to kill him."

5. Testimony from Robert Fitta, a neighbor of the victim, that the victim asked Fitta to intercept an allotment check mailed to Vickie from the military. Mr. Fitta removed the check from the mailbox. Defendant saw this and told Mr. Fitta to give him the check. Mr. Fitta refused. According to Mr. Fitta, defendant "was a little frustrated and said a few words, and told me that he had an M16, and he either preceded it or followed it up with, 'That's okay. He will get his. I've got an M16.' "

6. Testimony that the victim expressed plans to divorce Vickie, obtain custody of their daughter, and sue defendant for credit card fraud.

7. Defendant's 1998 statement to an SBI investigator that defendant "never got in trouble for using [the victim's] checks and credit cards and signing [the victim's] name, because Vickie Miller stated it was okay for him to use the checks and sign [the victim's] name to those checks and receipts."

8. Testimony from a neighbor, Denise Fitta, that she accompanied the victim to a local attorney's office about the divorce and credit card fraud matters. [T. p. 738]. The victim brought a folder with various items, including credit card receipts related to the victim's fraud claim and photos of his wife Vicki posing in a negligee with defendant. [T. p. 739]. The victim entrusted these items to Denise to keep at her house. Denise testified that defendant came to her house after the victim's death and said, "I want the stuff that [the victim] had given you." Denise gave the items to defendant.

9. Defendant's 1972 statement to investigators that, on the evening of the victim's murder, Vickie and defendant had "an argument over her comment that she was thinking of leaving him, Hayden, and going back to her husband." Defendant also stated that Vickie left around 10:00 pm that night to meet the victim, and then returned about 20 minutes later. After Vickie returned, defendant told investigators that he "took the car and drove around to cool off[.]"

Viewing all this in the light most favorable to the State, we hold that a rational juror could infer from these circumstances defendant's intent to kill the victim. This Court has, in the past, held that evidence of a defendant's history of threats or physical abuse of the victim constitute evidence of defendant's motive to kill that victim. *See, e.g.,*

*State v. Pastuer*, —— N.C. App. ——, ——, 697 S.E.2d 381, 385-86 (2010) (finding sufficient evidence of motive where the defendant "had displayed hostility towards [the victim], [the defendant] had a history of abusing [the victim], and [the victim] was extremely afraid of [the defendant] to the point of obtaining a domestic violence protective order against him several months prior to her death"); *State v. Lee*, 294 N.C. 299, 303, 240 S.E.2d 449, 451 (1978) (finding sufficient evidence of motive where "the State's evidence show[ed] that defendant probably beat the victim on two occasions just before her death, and it further show[ed] that defendant threatened to kill the victim a day or two before her death"); *State v. Furr*, 292 N.C. 711, 716-17, 235 S.E.2d 193, 197-98 (1977) (finding sufficient evidence of motive where "the evidence show[ed] that defendant wanted [the victim] dead; that he actively sought her death; and that he harbored great hostility toward her[,]" including telling the victim he would "grind her up like hamburger meat" and asking several people to kill his wife).

As noted above, in the case at hand, the evidence tended to show hostility between the victim and defendant that erupted at times in physical violence and threats: e.g., the physical altercation between defendant and the victim, the victim's anger at his wife's having lived with another man during his absence, the victim's preventing his wife from receiving her allotment check, and defendant's three statements—amounting to threats against the victim's life—to Mr. Gill and Mr. Fitta that he had an M16 and the victim "would get his[.]"

Defendant argues that his threats were not as "explicit" as those in *Furr* and *Lee* and could have only constituted "ego-preserving boasts," but such interpretations are within the province of the jury. *See Thomas*, 296 N.C. at 244, 250 S.E.2d at 209. Furthermore, the State is not required to eliminate every innocent explanation of the facts. *See State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). Taken in a light most favorable to the State, this Court concludes that the State presented sufficient evidence from which a rational juror could conclude the existence of a motive to kill the victim.

B. Evidence of defendant's opportunity to kill the victim.

[2] Evidence presented by the State tending to prove defendant's opportunity to kill the victim included the following:

1. Defendant's 1972 statement to investigators that Vickie left to meet the victim around 10:00 pm on 16 September 1972. Defendant stated that Vickie was gone for about 20 minutes.

2. Defendant's statement to investigators that defendant took a drive to "cool off" after Vickie returned home. In defendant's 17 September 1972 statement to investigators, he stated that he left the home around 10:30 pm and returned home around 10:40 to 10:45 pm. In defendant's 1973 statement, defendant stated that he returned home around 10:30 or 10:40 pm.

3. The 911 call reporting the discovery of the victim's body was received at 10:25 pm on 16 September 1972.

4. Defendant's statements to law enforcement investigators describing the route he drove to "cool off" the night the victim died. In defendant's 1972 statement, he stated that he drove by the New River Shopping Center. Defendant's 1973 statement also described his route as including New River Shopping Center. In defendant's 1998 statement, he said that he drove by the Brynn Marr Shopping Center and made no mention of the New River Shopping Center. An investigator testified at trial that defendant's 1998 statement "was significant . . . because in all of the previous reporting [defendant] indicated he had driven down to the New River Shopping Center, which is quite a distance from the crime scene. And the reason [the investigator] thought it was significant when [defendant] mentioned this—and he volunteered it—is because Brynn Marr is where [the police] had the reports that Vickie was supposed to meet Bill when she called him the night of the murder, and it's not too far from the crime scene itself." Another investigator estimated at trial that the shopping center was approximately two miles from the scene of the murder.

5. Testimony that Brynn Marr Shopping Center was located on the "Western Boulevard end, closest to [Highway] 24[,]" and that the victim was found dead outside of his car on the part of Western Boulevard that "was just a two-lane road through the woods." The first witnesses on the scene found a cigarette on the ground next to the victim that was still burning.

In order for this Court to hold that the State has presented sufficient evidence of defendant's opportunity to commit the crime in question, the State must have presented at trial evidence not only placing the defendant at the scene of the crime, but placing him there at the time the crime was committed. *See, e.g., Pastuer,* —— at ——, 697 S.E.2d at 386 (holding insufficient evidence of opportunity was presented where the State presented physical evidence, including the

victim's blood on the defendant's shoe and the defendant's finger-prints at the crime scene, because it presented no evidence "that defendant was seen around [the victim]'s home or in her car any time" near the time of the murder); *State v. Scott*, 296 N.C. 519, 522, 251 S.E.2d 414, 416-17 (1979) (holding insufficient evidence of opportunity was presented where the State presented testimony that the defendant's fingerprint was on a box that had only been seen being handled by the victim's family, but also testimony that the box could have been handled by the defendant at a time other than the time of the crime, because the State was required to present "substantial evidence of circumstances from which the jury can find that the finger-prints could only have been impressed at the time the crime was committed") (citation and quotations omitted). *Cf. State v. Lowry*, 198 N.C. App. 457, 470, 679 S.E.2d 865, 873 (2009) (holding that "(1) defendant's being in possession of the victim's car shortly after the probable time of her death, (2) defendant's also having possession of other property (jewelry and an ATM card) belonging to the victim that would have likely been taken at the time of the victim's death, (3) defendant's familiarity with the victim's house and access to the house [in] the days before the murder, and (4) defendant's effort to eliminate evidence by wiping down the car and his flight when confronted by police" constituted sufficient evidence of opportunity); *State v. Cutler*, 271 N.C. 379, 381, 384, 156 S.E.2d 679, 681, 682 (1967) (holding sufficient evidence of opportunity was presented where the State presented evidence that, on the day of the murder, a truck similar to defendant's was seen at the victim's house, which was the scene of the crime, before and after the body was discovered, its interior covered in human blood of two different types; on that day, the defendant went to the home of a relative 500 yards from the victim's home and was described as drunk and "bloody as a hog" with a large gash on his head; after the murder, the defendant was found by police wearing bloody clothing; and the defendant was found in possession of a knife with both human blood and a hair deemed "similar" to the chest hair of the victim on it).

In the case *sub judice*, taking the evidence in the light most favorable to the State, the only evidence presented at trial as to defendant's opportunity to commit the crime in question was from defendant's 1998 statement, made 26 years after the murder, that he was briefly in a spot two miles away from the scene of the crime. No evidence was presented at trial placing defendant at the scene of the crime, much less placing him there at the time the crime was com-

mitted. As such, we cannot hold that the State presented sufficient evidence of defendant's opportunity to commit the crime in question.

C. <u>Evidence of defendant's means to kill the victim—specifically, of his connection to the murder weapon.</u>

**[3]** Defendant argues that the State's evidence of defendant's means to kill the victim rested on "hearsay evidence that [defendant] allegedly claimed he had an M16" and on a theory that the defendant could steal an M16 during his tenure in the military without being detected. Defendant argues that the fact that no murder weapon was recovered, the lack of evidence that defendant actually had an M16, and the lack of identifying characteristics between the shell casings found at the scene compared to test rounds fired from an M16 prevented the State from presenting sufficient evidence of defendant's means to kill the victim. We agree.

Evidence relevant to the issue of defendant's connection to a murder weapon included the following:

1. Testimony from Mr. Gill that defendant told him that he stole an M16 off a military float, but that Gill never actually saw defendant with an M16.

2. Mr. Gill's statement to an investigator in 1974 that "one month prior to [the victim's return] from Okinawa, [Gill] was at . . . Miller's [house]; that [defendant] was working on his car and took out a live M16 round from the glove box; that he took . . . it to the trunk of the vehicle and loaded it into a magazine; that, at that time, [Gill] also saw another magazine in the trunk, and that the other magazine also had some live rounds in it. That when [defendant] did this, he said that he had an M16 rifle that he had stolen off a ship while they were on a Mediterranean or Caribbean cruise." Mr. Gill further stated that he never actually saw an M16 rifle.

3. Testimony from Mr. Fitta that defendant told him he had an M16.

4. Testimony that two M16 magazines were found in the glove box of defendant's vehicle the morning after the victim was killed.

5. Defendant's 1998 statement to an investigator that he had "admitted having M16 magazines, but no live ammunition."

6. Testimony from an investigator that the marines maintained "close records kept by serial numbers of weapons" and that a missing weapon would result in a "lockdown." The investigator testified on redirect that there were "ways to get around the checks."

7. Testimony that the two shell casings found near the victim's body were 0.233/5.56 caliber; that the shell casings were stamped "TW71" indicating that they were manufactured by Twin Cities; and that, according to the State's witness, Twin Cities is a "government-owned company that manufactures ammunition for the military."

8. Testimony by the State's ballistics expert comparing the shell casings found at the scene with test cartridges fired from an M16 rifle registered to defendant by the military, which had been retrieved from the military base for the purpose of comparison. The expert witness testified that he did not find any "identifying characteristics" between the shell casings found at the scene and the cartridges that were test fired from the M16.

9. The ballistics expert testified that he could not determine whether the two shell casings found at the scene were fired from the same gun; that he could not determine the type of rifle that fired the shell casings; and that he could not determine whether the bullet fragments found in the victim's body came from the shell casings. On redirect, the ballistics expert testified that the shell casings could have been fired from an M16.

Defendant's argument that the State's evidence was insufficient to connect defendant to a murder weapon finds fairly strong support in the analogous case of *State v. Lee*, 34 N.C. App. 106, 237 S.E.2d 315 (1977). In that case, this Court held that the State presented strong evidence of a motive to kill the victim, but ultimately failed to provide sufficient evidence "to permit a jury to find that the criminal act was committed by the defendant." *Id.* at 108, 237 S.E.2d at 317. The following constituted the State's evidence linking defendant to a weapon:

Two lead fragments were taken from the body of [the victim], but they were unsuitable for identification. The State introduced into evidence a .25 caliber pistol, identified as State's Exhibit 1, that defendant's sister gave to the officer when he went to the home of defendant's father on [the evening of the murder]. Defendant's father testified that the defendant had a "small pistol" with him

when he came [home that evening]. One of defendant's neighbors . . . testified that defendant had a black .25 caliber pistol with him in his trailer a few days before the death of [the victim], and that the pistol was similar to State's Exhibit 1. The State introduced into evidence a fired cartridge casing, identified as State's Exhibit 7, which was found to be similar to cartridges test-fired from State's Exhibit 1. However, the State's firearms expert could not conclusively determine whether or not State's Exhibit 7 had been fired from State's Exhibit 1.

*Id.* at 107, 237 S.E.2d at 315. This Court held that there was

no direct evidence to connect [the .25 caliber pistol introduced by the State] with the defendant. Only by indulging in speculation and assuming facts not in evidence can the inference be drawn that State's Exhibit 1 was ever at any time in defendant's possession. Neither was there any evidence that State's Exhibit 1 was used to kill the deceased. State's Exhibit 7, the fired cartridge casing, could not be conclusively connected to State's Exhibit 1, but even if the connection could have been made, there was no evidence as to where State's Exhibit 7 had come from or what connection, if any, it may have had with the death of the decedent.

*Id.* at 108-09, 237 S.E.2d at 317.

The facts of this case are also similar to those in *State v. Allred*, 279 N.C. 398, 183 S.E.2d 553 (1971). The victim in that case died as a result of a .25 bullet fired from a .25 automatic pistol. *Id.* at 404, 183 S.E.2d at 557. The only evidence tending to connect the defendant to the murder weapon was the victim's father's testimony that the defendant said he bought a .25 automatic "blue steel" pistol a month before the victim's death. *Id.* at 404, 183 S.E.2d at 557-58. There was "no evidence *such a pistol* was seen in defendant's possession at any time before or after [the victim's] death" or that "defendant fired any pistol on [the night victim died]." *Id.* at 404, 183 S.E.2d at 558 (emphasis original). The State also offered the testimony of three witnesses who observed the defendant and the victim "scuffle" that night, but noted that each witness's version "differ[ed] sharply" and could not be "reconcile[d] . . . particularly on the issues of whether defendant had a 'gun' and, if so, what he did with it." *Id.* The Court noted that "[t]here [wa]s no testimony that defendant had a .25 automatic pistol at Robbins Crossroads on [the night the victim died]. Nor [wa]s there testimony that defendant fired any pistol on that occasion." *Id.* at 404, 183 S.E.2d at 557. In conclusion, the Court held that "the State . . .

failed to offer substantial evidence that the bullet which caused [the victim's] death was from a .25 automatic pistol *fired by defendant.*" *Id.* at 406, 183 S.E.2d at 559 (emphasis original).

In the case *sub judice*, as in *Lee*, no one saw defendant in the possession of an M16; and, as in *Allred*, the only evidence that defendant had a gun, much less the murder weapon, was the testimony of someone to whom defendant stated that he had such a gun.

In sum, the State's evidence of defendant's means to commit the murder consists of three statements made to Mr. Gill and Mr. Fitta that defendant had stolen an M16 from the military and an investigator's testimony that it was possible to steal a weapon from the military without being detected. The State did not present evidence as to how defendant could have obtained an M16 beyond his boasts that he had done so and vague testimony that such a theft might have been possible; no witnesses testified that they had ever seen defendant in possession of such a gun, and the State presented no other evidence supporting such a conclusion.

Indeed, the State could not establish that an M16 fired the type of shell casing found at the crime scene. While evidence was presented that the bullets associated with those casings were made by a manufacturer that made bullets for military use, again, the State did not present evidence that tied those bullets to the crime, nor even to the time frame during which the crime took place.

Arguably, the discovery of M16 magazines in defendant's glove box makes the State's evidence of means less speculative; however, it bears repeating that the State did not present evidence that an M16 was in fact the murder weapon. The State presented evidence only that a high velocity rifle that *might* have been an M16 could have fired the bullets associated with those shell casings. The State presented no evidence that the magazines in defendant's glove box contained the type of bullets associated with the shell casings found at the scene.

## IV. Conclusion

In conclusion, the State presented sufficient evidence of hostility between the defendant and victim from which a rational juror could conclude defendant had a motive to kill the victim. However, the State did not present sufficient evidence that defendant had either the opportunity or the means to commit the murder: no evidence was presented to connect defendant with the crime scene at any time, much less the time the crime was committed, and no murder weapon

was introduced at trial. While it is true that "[c]ontradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve[,]" *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993) (citation omitted), the lack of evidence does not qualify as either. Accordingly, we hold that the State failed to present sufficient evidence from which a rational juror could conclude that defendant was the perpetrator of the victim's murder.

As we reverse on this basis, we do not address defendant's other arguments.

Reversed.

Chief Judge MARTIN and Judge GEER concur.