IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-164

No. COA21-375

Filed 15 March 2022

Buncombe County, Nos. 17 CRS 83204, 17 CRS 83209, 17 CRS 83792

STATE OF NORTH CAROLINA,

v.

TIMOTHY ROBERT GALLION.

Appeal by defendant from judgment entered 11 February 2020 by Judge Carla Archie in Buncombe County Superior Court. Heard in the Court of Appeals 14 December 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Robert C. Montgomery and Special Deputy Attorney General Daniel P. O'Brien, for the State.*

*William D. Spence for Defendant-Appellant.*

CARPENTER, Judge.

¶ 1    Defendant appeals from judgment after a jury convicted him of first degree murder, possession of a firearm by a felon, and driving while impaired. After careful review of the record, we find no error.

## I.    Factual & Procedural Background

¶ 2    The State's evidence presented at trial tends to show the following: Defendant's wife, Ms. Gallion, testified that on 22 March 2017, Defendant made the following

statement to her: "I'm going to kill your mother, I'm going to kill your sister, and I'm going to kill everybody that knows you, and then I'll kill you." Ms. Gallion further testified that on the same day Defendant communicated the threats, she took out a warrant for his arrest.

¶ 3        At around 3:46 p.m. that day, officers of the Buncombe County Sheriff's Department were dispatched to Defendant's home to arrest him. The officers attempted to contact Defendant or Ms. Gallion but could locate neither of them on the property. They observed through the window of a workshop on Defendant's property "a handful of bullets on a shelf."

¶ 4        Sergeant Nathan Ball ("Sergeant Ball") of the Buncombe County Sheriff's Office oversaw the department's Community Enforcement Team, which handles community complaints including warrant services. He testified his team responded to the call to Defendant's home. Upon Sergeant Ball learning from his team Defendant was not at the residence, he went to the nearby intersection of Wittemore Branch Road and Barnardsville Highway, where Defendant might cross if he were to return home. As he was talking with his colleague Captain Elkins regarding the matter, they heard a dispatch for the fire department regarding a structure fire on Dillingham Road.

¶ 5        Sergeant Ball headed to the area of the fire, as he knew Defendant "had a previous address on Dillingham Road." On his way there, Sergeant Ball saw someone

getting into a green Dodge pickup truck, matching the description of Defendant's vehicle, parked beside Sheena's Restaurant. Sergeant Ball dispatched other members of his team to the location. The officers left Defendant's home, heading in the direction of the restaurant. Sergeant Ball knew Defendant was a convicted felon.

¶ 6       At around the same time that afternoon, Defendant went to the property of Tommy Carson ("Carson"), the uncle of Defendant's former wife, at 397 Dillingham Road where Carson's house is located and where Carson used to operate a grocery store. Carson testified Defendant approached and first asked him for beer or wine, but when Carson did not have these items, Defendant asked to borrow ten dollars. After Carson responded he did not have any money either, Defendant showed him his "bulletproof" jacket with a Buncombe County Sheriff's Office SWAT team patch affixed to an arm and a "9 millimeter Uzi" firearm.

¶ 7       Carson advised he was heading out but could pick up money for Defendant at the bank if Defendant wanted to follow him there. Defendant declined the offer telling Carson, "he had to go up the road to take care of some business." Carson witnessed Defendant get in his truck and go up the road. Carson drove away with Brooke Blagg ("Blagg") who lived on his property. Defendant ultimately left Carson's property shortly after Carson at 4:24 p.m. At 4:31 p.m. a call came into the fire department regarding a fire in Carson's building. Defendant stated in an interview with investigators on 23 March 2017 that he headed over to Sheena's Restaurant

after leaving Carson's house. According to Defendant, he asked the owner of the restaurant for twenty dollars, then went home. He also admitted to drinking six beers and "maybe four" Johny Bootlegger spirited beverages on 22 March 2017.

¶ 8    Blagg saw Defendant on Carson's property on 22 March 2017 and testified she and Carson "left the store and [Defendant] went up to the church and turned around and came back down" to Carson's property. She confirmed she saw Defendant leave the store and drive towards the house of Bobby Pegg ("Pegg'"), the victim. She added, "because right past the church [on Dillingham Road] is where [Defendant] had lived at with [Pegg]." "The church . . . it's going in the direction" of Pegg's house.

¶ 9    Officers located Defendant traveling on Barnardsville Highway and followed him after he turned on Wittemore Branch Road. Defendant did not stop his vehicle when two police cars pursued him with blue lights and sirens activated.

¶ 10    Officers eventually stopped Defendant via a roadblock. They approached his vehicle with guns drawn and removed Defendant from the vehicle after he refused to show his hands. In Defendant's vehicle, officers found two firearms in plain view. The officers also observed "blood on the steering wheel, on a door, [and on] the driver's seat." Officers arrested Defendant at approximately 4:43 p.m. and took inventory of his truck. They recovered firearms including a Ruger 9-millimeter "shotgun" and a Cobray 9-millimeter pistol as well as three 9-millimeter magazines, one 9-millimeter flash suppressor, and 9-millimeter ammunition. The 9-millimeter ammunition

included "silver-colored casings with the headstamp of FC LUGER 9 MM." Officers performed a pat down of Defendant and located a GPS monitoring device on his left ankle. They also "noticed a strong odor of alcohol" coming from Defendant's person. Defendant was transported to a detention center where he refused to perform an alcohol breath test; his blood was drawn for analysis pursuant to a search warrant.

¶ 11        Deputy Leslie Meade ("Deputy Meade") of the Buncombe County Sheriff's Department performed standardized field sobriety tests on Defendant. Deputy Meade testified Defendant showed six of six clues on the horizontal gaze nystagmus ("HGN") test, and seven of eight clues on the walk and turn test. Defendant refused to complete the one-legged stand test.

¶ 12        At approximately 2:00 p.m. the following day—23 March 2017—Pegg's niece, Summer Riddle ("Riddle") and his mother, Jeanette Pegg, arrived at Pegg's house on 665 Dillingham Road to check on him after they had not heard from him since 21 March 2017. Defendant's brother owned the house where Pegg lived, and Defendant had performed carpentry work and repairs on the house.

¶ 13        Pegg was last seen alive on 22 March 2017 at about 1:00 p.m. by his neighbor who witnessed Pegg standing in his driveway. Riddle and Jeanette Pegg found Pegg's deceased body sitting on the couch in the living room. Riddle testified the kitchen door was unlocked when she arrived at the house, and it was normal for Pegg to leave the house unlocked when he was home. Riddle and Jeanette Pegg called 911 within

minutes of arriving on the scene. Law enforcement responded to the 911 call and initiated a homicide investigation. Officers found silver-colored shell casings with the headstamp "FC LUGER 9 MM," matching the description of the bullets found in Defendant's vehicle, around Pegg's body.

¶ 14    An autopsy revealed Pegg died from gunshot wounds to his head, although an exact date or time of death could not be determined from the examination. The autopsy report shows Pegg had three gunshot wounds to his head. Two of the wounds had "soot and stippling" around them, indicating the muzzle of the gun was close to Pegg when fired. The third wound did not have soot or stippling, indicating the gun was fired at an "indeterminate range" from the deceased.

¶ 15    On 29 January 2020, Defendant filed a pretrial motion to suppress any evidence seized during the search of his home address on the basis the search warrant affidavit "fails to implicate the premises," as required by N.C. Gen. Stat. § 15A-244, the North Carolina Constitution, and the United States Constitution. Defendant also moved to suppress evidence of GPS data on the grounds his statutory rights were violated when privileged information, namely GPS data of his movements, was orally provided by the North Carolina Department of Public Safety ('DPS") to law enforcement before a court order was issued. On 3 February 2020, the trial court heard Defendant's motion to suppress and orally announced its findings of facts and conclusions of law in open court. The trial court concluded there had been no

substantial violation of Chapter 15A that warranted suppression and denied Defendant's motion.

¶ 16    A jury trial began on 3 February 2020 before the Honorable Carla Archie in Buncombe County Superior Court. Defendant admitted to having been previously convicted of three charges of driving while impaired, resulting in a conviction of habitual driving while impaired.

¶ 17    At trial, Alyssa Tinnin ("Tinnin") was tendered by the State as an expert in the field of forensic toxicology. Tinnin testified she conducted a chemical analysis on the blood sample identified as that taken from Defendant. Tinnin opined Defendant's blood sample contained 0.17 grams of alcohol per 100 milliliters.

¶ 18    Elizabeth Wilson ("Wilson"), is a firearms examiner who, at the time of the hearing, was employed by the North Carolina State Crime Laboratory. Wilson was tendered as an expert in the area of firearms identification and examination. Wilson testified that she performs all tests on firearms based on reliable facts and data. She examined the Cobray 9-millimeter and Ruger 9-millimeter firearms seized from Defendant's vehicle. Wilson also did comparison examinations of the shell casings, bullets, and projectiles that were collected from the homicide crime scene. Based on the results of her examination, Wilson concluded that seven shell casings found around Pegg's' body, the "caliber .38 class fired copper jacket" fragment that was imbedded in wood at Pegg's home, the "caliber .38 class fired copper jacket" collected

from Pegg's temple, and the "caliber .38 class fired jacketed bullet" collected from Pegg's jaw were all fired from the same Cobray 9-millimer pistol seized from Defendant.

¶ 19      On 27 March 2017 at approximately 1:58 p.m., Sergeant Ryan Jordan ("Sergeant Jordan") of the Buncombe County Sheriff's Department obtained a search warrant for Defendant's GPS monitoring data obtained from Defendant's previously mandated post-release electronic monitoring device. The search warrant was executed at 2:13 p.m. that afternoon. Sergeant Jordan testified he obtained the information sought in the search warrant from Joan McCurry ("McCurry"), the Chief Probation and Parole Officer for DPS, approximately three days after he executed the search warrant.

¶ 20      At trial, McCurry testified regarding the GPS communication device Defendant was wearing and the business records created from such a device. McCurry testified at the suppression hearing she verbally provided Defendant's GPS data pinpoints for the date of 22 March 2017 to Captain Elkins and Sergeant Jordan upon their request and before a search warrant was issued.

¶ 21       Michelle Wilson, an account manager for BI Incorporated, also testified. BI Incorporated contracted with the Department of Public Safety of the State of North Carolina to provide an electronic curfew monitoring service that the State uses for its adult probation and parole section. Michelle Wilson explained that due to

atmospheric conditions, GPS points could drift but depending on how many satellites are tracking at a given time, the GPS data is generally accurate within a range of 25 to 100 feet. She testified the GPS data for Defendant showed Defendant was at the address of 665 Dillingham Road, Pegg's home, at 4:07 p.m. on 22 March 2017. The State also offered evidence through Michelle Wilson tending to show Defendant was at Pegg's home between the hours of 3:00 p.m. to 4:22 p.m. on 22 March 2017.

¶ 22 A search warrant for Defendant's home was issued on 27 March 2017 at approximately 7:59 p.m. and was executed that evening at 8:29 p.m. Officers seized 9-millimeter ammunition with the headstamp "FC LUGER 9 MM" from inside Defendant's workshop and seized ammunition, handwritten notes, and numerous firearms from Defendant's home.

¶ 23 On 22 March 2017, Defendant was charged with driving while impaired, driving while license revoked for impaired driving, possession of a firearm by a felon, second degree arson, and first degree murder. On 7 August 2017, a Buncombe County grand jury indicted Defendant on the charges of driving while licensed revoked, in violation of N.C. Gen. Stat. § 20-28(a1); habitual impaired driving, in violation of N.C. Gen. Stat. § 20-138.5; possession of a firearm by a felon, in violation of N.C. Gen. Stat. § 14.415.1; second degree arson, in violation of N.C. Gen. Stat. § 14-58; and first degree murder, in violation of N.C. Gen. Stat. § 14-17.

¶ 24 At the close of the State's evidence, Defendant moved to dismiss the charges of

second degree arson and first degree murder based on insufficiency of evidence. The trial court denied his motion. Defendant renewed his motion to dismiss at the close of all evidence, which was also denied. On 11 February 2020, the State dismissed the charge of driving while licensed revoked. On the same day, the jury found Defendant guilty of driving while impaired, possession of a firearm by a felon, and first degree murder; the jury found Defendant not guilty of second degree murder. Defendant gave oral notice of appeal in open court.

## II.    Jurisdiction

This Court has jurisdiction to address Defendant's appeal from a final judgment pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2021) and N.C. Gen. Stat. § 15A-1444(a) (2021).

## III.    Issues

The issues before this Court are whether: (1) probable cause existed for the magistrate to issue the search warrant for Defendant's residence; (2) the findings of fact are supported by competent evidence and whether the findings of fact in turn support the conclusions of law in the trial court's ruling on Defendant's motion to suppress evidence seized from his residence; (3) the trial court committed plain error in refusing to suppress electronic monitoring data where the Secretary of DPS allowed Defendant's GPS data to be orally released before a search warrant was issued; (4) the trial court erred by refusing to allow Defendant to cross-examine a

witness about a Facebook message; (5) the trial court committed plain error by admitting testimony on firearms identification and examination from the State's expert witness; and (6) the trial court erred by denying Defendant's motion to dismiss the first degree murder charge.

## IV.  Motion to Suppress Evidence Obtained from Defendant's Residence

¶ 27      In his first argument, Defendant challenges the sufficiency of the search warrant application for his residence as well as the trial court's denial of his motion to suppress all evidence seized through a search warrant of this address.

### A. Sufficiency of the Search Warrant Application

¶ 28      We first consider Defendant's argument that the search warrant affidavit is defective because it fails to implicate his home address and does not provide a basis to support probable cause.

¶ 29      The Fourth Amendment to the Constitution of the United States, made applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amends. IV, XIV.  Under the Fourth Amendment, a search warrant may be issued only "upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

¶ 30      "Article I, Section 20 of the Constitution of North Carolina likewise prohibits

unreasonable searches and seizures and requires that warrants be issued only on probable cause," although the language of the North Carolina Constitution differs from that of the United States Constitution. *State v. Allman*, 369 N.C. 292, 293, 794 S.E.2d 301, 302–03 (2016); *see* N.C. Const. art. I, § 20; *see also* N.C Gen. Stat. § 15A-245 (2021).

¶ 31    The North Carolina Supreme Court adopted the "totality of the circumstances test to determine whether probable cause exists under Article I, Section 20" of the North Carolina Constitution. *Allman*, 369 N.C. at 293, 794 S.E.2d at 303. "Our case law makes clear that when an officer seeks a warrant to search a residence, the facts set out in the supporting affidavit must show some connection or nexus linking the residence to illegal activity. Such a connection need not be direct, but it cannot be purely conclusory." *State v. Bailey*, 374 N.C. 332, 335, 841 S.E.2d 277, 280 (2020).

¶ 32    Under North Carolina law, an application for a search warrant must meet certain requirements, including that it "be made in writing upon oath or affirmation." *See* N.C. Gen. Stat. § 15A-244 (2021). Additionally, each application must contain:

> (1)    The name and title of the applicant; and
> (2)    A statement that there is probable cause to believe that items subject to seizure under [N.C. Gen. Stat. §] 15A-242 may be found in or upon a designated or described place, vehicle, or person; and
> (3)    Allegations of fact supporting the statement. The statements must be supported by one or more affidavits particularly setting forth the facts and circumstances establishing probable cause to believe

that the items are in the places or in the possession of the individuals to be searched; and

(4) A request that the court issue a search warrant directing a search for and the seizure of the items in question.

N.C. Gen. Stat. § 15A-244(1)–(4).

¶ 33 A search warrant "affidavit is sufficient if it supplies reasonable cause to believe that the proposed search for evidence of the commission of the designated criminal offense will reveal the presence upon the described premises of the objects sought and that they will aid in the apprehension or conviction of the offender." *State v. Vestal*, 278 N.C. 561, 575–76, 180 S.E.2d 755, 765 (1971) (citations omitted); *see also* N.C. Gen. Stat. § 15A-244. "A magistrate must make a practical, common-sense decision, based on the totality of the circumstances, whether there is a fair probability that contraband will be found in the place to be searched." *State v. McKinney*, 368 N.C. 161, 164, 775 S.E.2d 821, 824 (2015) (citations and internal quotation marks omitted). Additionally, "a magistrate is entitled to draw reasonable inferences from the material supplied to him by an applicant for a warrant." *State v. Sinapi*, 359 N.C. 394, 399, 610 S.E.2d 362, 365 (2005).

¶ 34 It is well-established that "great deference should be paid a magistrate's determination of probable cause and . . . after-the-fact scrutiny should not take the form of a *de novo* review." *State v. Lewis*, 372 N.C. 576, 584, 831 S.E.2d 37, 43 (2019) (citation omitted). "Instead, a reviewing court is responsible for ensuring that the

issuing magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." *McKinney*, 368 N.C. at 165, 775 S.E.2d at 825 (citations and internal quotation marks omitted).

¶ 35 Here, Sergeant Jordan included with his application for a search warrant an affidavit stating his name and title, as well as the following statement regarding probable cause:

> Based on my training and experience, and the facts as set forth in this affidavit, I believe that in records in and around the residence, outbuildings, and curtilage of [Defendant's residence] in Barnardsville, NC there exists evidence of a crime and contraband or fruits of that crime.

¶ 36 After reciting his training and experience in the affidavit, Sergeant Jordan made the following allegations of fact to support his statement of probable cause:

> (1) On 3-23-2017, the Buncombe County Emergency Operations Center received a call on 911 stating that an individual had been discovered with an apparent gunshot [wound] at 665 Dillingham Rd, Barnardsville, NC. First Responders arrived on scene and located Bobby Ray Pegg II deceased in his home. Detectives with the Buncombe County Sheriff's Office (BCSO) responded to the residence and began conducting an investigation.
>
> (2) During the investigation, detectives located several silver colored spent 9mm shell casings in the area around Pegg's body. All the silver colored spent 9mm shell casings were head stamped with "F C LUGER 9MM."
>
> (3) Detectives discovered the last time Pegg had been seen alive, was on 3-22-2017 at approximately 12:30 p.m.

(4)     On 3-22-2017 it was reported to the BCSO that throughout the day, Timothy Robert Gallion had been making threats to his family stating that he would kill them, kill any law enforcement that attempted to apprehend him, and then kill himself. An arrest warrant was obtained by family members for Communicating Threats.

(5)     Deputies traveled to Gallion's residence . . . on 03-22-17 to search for Gallion. While there, deputies went to a workshop just down the driveway from the residence. A deputy looked into the window to see if Gallion was in the workshop and observed a handful of bullets on a shelf.

(6)     Gallion was located on Whittemore Branch Rd in Barnardsville, NC, driving a green 1996 Dodge Ram Pickup Truck, where he was arrested for his open warrants. Gallion was located at approximately 4:43 pm on 3-22-2017. Whittemore Branch Rd is in close proximity to 665 Dillingham Rd.

(7)     During the arrest, multiple firearms were seen in plain view in the 1996 Dodge Ram Pickup Truck. Two (2) of the firearms located in the pickup truck were 9mm pistols. Also located inside the truck, were multiple boxes of ammunition. All 9mm ammunition had silver colored shell casings with the head stamp of "F C LUGER 9MM." This ammunition is similar to the spent shell casings located in the proximity of Pegg's body.

(8)     During the arrest, the arresting officers observed that Gallion was intoxicated. Gallion was subsequently charged with Driving While Impaired.

(9)     During the inventory of the 1996 Dodge Ram Pickup, officers observed blood smears inside the vehicle on the steering wheel, driver's seat, and interior portion of the driver's side door. Gallion also had blood on his hands.

(10)    Detectives interviewed a witness who stated that on 3-22-2017, he spoke with Gallion at 456 Dillingham Rd. When asked about Adrian Gallion, Timothy

Gallion's brother, Timothy Gallion became upset and stated that he was angry for not being paid for work he had done on a home his brother owned. This residence is the home located at 665 Dillingham Rd, Barnardsville, NC where Pegg was found deceased on 3-23-2017.

(11)     The witness stated Gallion showed him a pistol during their conversation. The pistol matched the description of one of the 9mm pistols found in the green Dodge Ram Pickup truck when Gallion was arrested.

(12)     The witness stated that later in the conversation, Gallion pointed at a Buncombe County Sheriff's Office patch affixed to his shirt and made the comment that the patch could get him out of trouble. At the time of Gallion's arrest, he was wearing clothing with the Buncombe County Sheriff's Office patch affixed to it.

(13)     The witness described Gallion as being intoxicated at the time of their conversation.

(14)     Detectives spoke with a separate witness who stated they observed Gallion driving in the direction of 665 Dillingham Rd. The time was estimated to be at approximately 3:30 pm.

(15)     The affiant knows that Gallion was charged in an incident in 2012 involving the discharge of a firearm at another person, which resulted in a conviction.

¶ 37     Sergeant Jordan included in his description of items to be seized, *inter alia*, bloodstains, DNA evidence, weapons, ammunition, drugs, and drug paraphernalia.

¶ 38     Defendant points to *State v. Campbell*, 282 N.C. 125, 191 S.E.2d 752 (1972) and *State v. Armstrong*, 33 N.C. App. 52, 234 S.E.2d 197 (1977) to argue the trial court erroneously denied his motion to suppress because Sergeant Jordan's affidavit "fail[s] to reveal any underlying facts or circumstances implicating the

premises/outbuildings at [his residence] to any crime." Specifically, Defendant contends "[n]othing connects the [allegation in the affidavit that there were] 'bullets on a shelf'" in his workshop, to the bullets found in his truck or the bullet casings found near the homicide victim. We disagree.

¶ 39    In *Campbell*, officers sought a warrant to search the residence of suspected drug dealers for illegal drugs, but the search warrant did not state any underlying facts about the residence other than the suspects lived in the house. 282 N.C. at 130, 191 S.E.2d at 756. Our Supreme Court held that the search warrant affidavit was "fatally defective" because it "did not provide a sufficient basis for a finding of probable cause to search the premises described in the warrant . . . ." *Id.* at 131–32, 191 S.E.2d at 757. The Court reasoned that "nothing in the . . . affidavit affords a reasonable basis upon which the issuing magistrate could conclude that any illegal possession or sale of narcotic drugs had occurred, or was occurring, on the premises to be searched. *Id.* at 131, 191 S.E.2d at 757.

¶ 40    Similarly, in *Armstrong*, an officer received a warrant to search the residence of a suspect who was alleged to have participated in illegal sales of marijuana. 33 N.C. App. at 55, 234 S.E.2d at 198. Our Court concluded that there was "no allegation [in the search warrant affidavit] that any marijuana was ever seen, kept, sold, or delivered" at the defendant's residence. *Id.* at 55, 234 S.E.2d at 199.

¶ 41    Here, there is no direct evidence linking the "handful of bullets on a shelf" seen

in Defendant's workshop to the charge of first degree murder. *See Bailey*, 374 N.C. at 335, 841 S.E.2d 277 at 280. However, other facts alleged in the affidavit show "*some connection or nexus*" to link Defendant's residence to the murder. *See id.* at 335, 841 S.E.2d 277 at 280 (emphasis added). The allegations include: (1) Defendant was arrested and found with two 9-millimeter firearms in his truck; (2) the ammunition found in Defendant's truck, following his arrest, was consistent with the shell casings found around the murder victim's body; (3) there were blood smears inside of Defendant's truck and on his hands when he was arrested; (4) Defendant was arrested near the scene of the crime; (5) Defendant made statements to a witness on the day he was arrested which implied he had motive to kill the victim, and Defendant showed the witness a pistol during the conversation; and (6) the pistol Defendant showed the witness matched the description of the firearm found in Defendant's truck.

¶ 42      We conclude the allegations in Sergeant Jordan's affidavit were sufficient to allow a magistrate to reasonably infer that evidence related to the murder such as weapons, ammunition, bloodstains, and DNA evidence could likely be found at Defendant's residence and would aid in the apprehension or conviction of the offender. *See Vestal*, 278 N.C. at 575–76, 180 S.E.2d at 765; *Sinapi*, 359 N.C. at 399, 610 S.E.2d at 365; *see also State v. Rook*, 304 N.C. 201, 221–22, 283 S.E.2d 732, 745 (1981) (holding an affidavit clearly established probable cause to believe that a

wooden club and bloody clothing constituted evidence of the crime being investigated, and that the items were probably located in the defendant's home even though there was no direct evidence linking the crime to the home). Given the totality of the circumstances, "the issuing magistrate had a substantial basis for . . . conclud[ing] that probable cause existed" in this case. *See McKinney*, 368 N.C. at 165, 775 S.E.2d at 824–25.

**B. The Trial Court's Findings of Fact & Conclusions of Law**

¶ 43        Defendant next contends the evidence and record do not support the trial court's finding of fact stating:

> [b]ased on Officer Jordan's training and experience and
> facts uncovered as part of law enforcement's investigation,
> he articulated as part of both search warrants items that
> he was looking for that were relevant to the investigation
> and that would aid in the apprehension or conviction of a
> suspect, namely the defendant.

Moreover, Defendant contends that the remaining findings do not support the trial court's conclusion of law finding sufficient probable cause for the issuance of the search warrant.

¶ 44        This Court's review of a trial court's decision on a motion to suppress "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate

conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982).

¶ 45          Following the hearing on Defendant's motion to suppress, the trial court ruled

on the motion, announcing its findings of fact and conclusions of law in open court.

The trial court made the following findings of fact:

> (1)     On March the 23rd, 2017, Buncombe County
>          Emergency Operations Center received a 911 call
>          stating that an individual had been discovered with
>          an apparent gunshot [wound] at 665 Dillingham
>          Road.
> (2)     First responders arrived on the scene and located
>          Bobby Pegg deceased in his home. They also located
>          several silver-colored spent 9 millimeter shell
>          casings in the area around Pegg's body.
> (3)     The shell casing were headstamped with FC LUGER
>          9 MM.
> (4)     Officers uncovered that the defendant, Timothy
>          Gallion, was making threats against his wife and
>          that she or someone in the family took out warrants
>          against the defendant for communicating threats.
> (5)     He was stopped in a green pickup truck on March
>          the 22nd, 2017, in close proximity to the scene of the
>          murder.
> (6)     He was served with the outstanding warrant for
>          communicating threats. And as part of the search of
>          the pickup truck, officers located two 9 millimeter
>          pistols, as well as 9 millimeter ammunition with
>          silver-colored shell casings and a headstamp of FC
>          LUGER 9 MM. That ammunition was similar to the
>          ammunition located near the homicide victim's body.
> (7)     Officers also found in the pickup truck blood smears
>          on the steering wheel, driver's seat, and interior
>          portion of the driver's side door. The defendant also
>          had blood stains on his hands.
> (8)     Officers talked to a witness who had a recent
>          conversation with the defendant. The witness

stated that later in the conversation [the defendant]
pointed at a Buncombe County Sheriff's Office patch
affixed to his shirt and said the comment, and made
the comment that the patch could get him out of
trouble.  At the time of the defendant's arrest, he
was wearing clothing with a Buncombe County
Sheriff's Office patch affixed to it.

(9)     On March the 27th, 2017, at 1:58 p.m. Officer Jordan
with the Buncombe County Sheriff's Department
obtained a search warrant for GPS monitoring data.
That search warrant was executed at 2:13 p.m. on
the same day.

(10)    At 7:59 p.m. Officer Jordan obtained a search
warrant for the defendant's residence at 95 Christy
Lane.  That search warrant was executed at 8:29
p.m. the same day.

(11)    Prior to obtaining the search warrant for GPS data,
Detective Elkins contacted Joan McCurry with the
Department of Public Safety Probation and Parole
Office.  Detective Elkins asked for GPS location data
of the defendant.

(12)    On or about March the 22nd, 2017, Ms. McCurry
provided Detective Elkins verbal information that
the defendant's location points were clustered
around points of interest in the investigation.

(13)    After receiving a search warrant, Ms. McCurry
provided a spreadsheet to Detective Jordan with
detailed location records for the defendant's
electronic monitoring.

(14)    Prior to locating the defendant as part of the traffic
stop, officers went to the defendant's residence
searching for him in order to serve the outstanding
communicating threats warrant.  They looked into
the window of a workshop outbuilding and saw
bullets on a shelf of unknown type, brand, or caliber.

(15)    Based on Officer Jordan's training and experience
and facts uncovered as part of law enforcement's
investigation, he articulated as part of both search
warrants items that he was looking for that were

> relevant to the investigation and that would aid in the apprehension or conviction of a suspect, namely the defendant.
>
> (16)    [T]he Secretary of the North Carolina Department of Public Safety has issued Administrative Memo 01.14 10-13 dated October 24, 2013, and updated by Tip of the Month dated May 2016 directing that Probation and Parole release electronic monitoring information to law enforcement without the need for a court order.

¶ 46    The trial court then made the following conclusions of law:

> (1)    Based on the foregoing findings of fact, the Court concludes as a matter of law that there was sufficient probable cause for the issuance of both search warrants.
>
> (2)    [T]here has been no substantial violation of Chapter 15A that warrants suppression, and, therefore, the defendant's motion to suppress is denied.

¶ 47    At the suppression hearing on 3 February 2020, Sergeant Jordan testified that based on his "training and experience" he knows that "rounds are [typically] stored not only with the weapon, but also typically in the home of an individual." He further testified based on his training and experience, information about a firearm, such as proof of purchase and documentation, is typically located in residences. Sergeant Jordan's investigation uncovered the fact that Defendant had bullets of an unknown type on the shelf at his residence as well as casings head-stamped with "FC LUGER 9 MM" found inside of his truck on 22 March 2017; Sergeant Jordan found casings matching the same description at the homicide scene of Bobby Pegg on 23 March

2017. Based on these facts, Sergeant Jordan requested items from Defendant's home in the search warrant which he and his team "believed probably existed at [Defendant's] residence," including bloodstain evidence, DNA evidence, electronic and telephonic communications, prescription drugs, controlled substances, photographs, weapons, and other types of evidence such as casings.

¶ 48        In light of Sergeant Jordan's testimony and the affidavit itself, there was competent evidence to support the finding challenged by Defendant. *See Cooke*, 306 N.C. at 134, 291 S.E.2d at 619. The trial court's findings of fact were supported by competent evidence, and thus, conclusively binding on appeal. *See id.* at 134, 291 S.E.2d at 619. Further, the trial court's ultimate conclusions of law are supported by its findings of fact. *See id.* at 134, 291 S.E.2d at 619. Therefore, the trial court did not err in denying Defendant's motion to suppress evidence from his residence.

## V.  Motion to Suppress Evidence of Defendant's Electronic Monitoring Data

¶ 49        In his second argument, Defendant contends the trial court erred in refusing to suppress electronic monitoring data and allowing the State to introduce the data at trial because DPS released Defendant's electronic monitoring information to law enforcement without a court order, in violation of N.C. Gen. Stat. § 15-207. The State argues Defendant is not entitled to a new trial because: "(1) the evidence introduced was obtained pursuant to a court order; (2) the Secretary of [DPS] consented to

disclosure of the evidence; (3) the evidence was not subject to suppression; and (4) officers would have sought a search warrant for the records regardless of any statutory violation." As discussed below, we agree with the State that no plain error occurred at trial.

Here, Sergeant Jordan was investigating the death of Bobby Pegg. In the course of the investigation, Sergeant Jordan found out from Captain Elkins, who was also investigating Pegg's death, that Defendant was a suspect and wore an electronic monitoring device. Sergeant Jordan and Captain Elkins spoke with McCurry about obtaining Defendant's GPS information, and she provided the requested data verbally over the telephone. Sergeant Jordan subsequently prepared and executed a search warrant for the GPS data, which was located in the care, custody, and control of DPS, and he received that information pursuant to the search warrant.

Although Defendant filed a pre-trial motion to suppress the GPS data, he acknowledges he did not object to the introduction of GPS evidence during the trial on the basis DPS released privileged information to law enforcement without a court order. Rather, Defendant objected at trial on the grounds the witness testifying regarding the DPS records did not "lay the proper foundation that th[e] GPS communication device was working properly . . . ." *See State v. Oglesby*, 361 N.C. 550, 554, 648 S.E.2d 819, 821 (2007) ("[A] trial court's evidentiary ruling on a pretrial motion is *not* sufficient to preserve the issue of admissibility for appeal unless a

defendant renews the objection during trial."); *see also* N.C. R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context."). Thus, Defendant did not properly preserve the issue for appeal as to the trial court's alleged statutory violation under N.C. Gen. Stat. § 15-207. *See* N.C. R. App. P. 10(a)(1). Therefore, we review the alleged statutory violation under the plain error standard. *See* N.C. R. App. P. 10(a)(4).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citing *United States v. McCaskill*, 676 F. 2d 995, 1002 (4th Cir. 1982) (internal quotation marks omitted).

¶ 52          N.C. Gen. Stat. § 15-207 creates a qualified privilege for:

> [a]ll information and data obtained in the discharge of official duty by any probation officer shall be privileged information, shall not be receivable as evidence in any

> court, and shall not be disclosed directly or indirectly to any
> other than the judge or to others entitled under this Article
> to receive reports, unless and until otherwise ordered by a
> judge of the court or the Secretary of Public Safety.

N.C. Gen. Stat. § 15-207 (2019); *see State v. Craft*, 32 N.C. App. 357, 361, 232 S.E.2d 282, 285, *disc. rev. denied*, 292 N.C. 642, 235 S.E.2d 63 (1977) (concluding the qualified privilege created by N.C. Gen. Stat. § 15-207 was inapplicable to case where "the items seized were not information and data").

¶ 53 For multiple reasons, we reject Defendant's argument the trial court erred in admitting his GPS data in this case. First, Defendant moved to suppress pursuant to N.C. Gen. Stat. § 15A-974 any evidence related to the search warrant seeking Defendant's GPS data obtained from the monitoring device he was wearing. Under N.C. Gen. Stat. § 15A-974(a)(2), evidence must be suppressed if "[i]t is obtained as a result of a substantial violation of the provisions of [*Chapter 15A*]." N.C. Gen. Stat. § 15A-974(a)(2) (2019) (emphasis added). Thus, Section 15A-974(a)(2) does not provide a mechanism by which Defendant could allege evidence was obtained as a result of a substantial violation of *Chapter 15*, the chapter under which the controlling statute, N.C. Gen. Stat. § 15-207, is found.

¶ 54 Second, the qualified privileged belonged to DPS, and DPS waived that privilege by releasing data to law enforcement as to where Defendant traveled on 22 March 2017. *See Craft*, 32 N.C. App. at 361, 232 S.E.2d at 285; *see also State v. Hardy*,

293 N.C. 105, 126, 235 S.E.2d 828, 841 (stating a qualified privilege can be waived). Pursuant to DPS's Administrative Memorandum 01.14.10-13 effective 24 October 2013, DPS was allowed to "[p]rovide location information [of offenders subject to electronic monitoring] to law enforcement at their request." The policy was re-published in DPS's May 2016 Tip of the Month interoffice memorandum. Copies of both documents were admitted into evidence during the suppression hearing.

Lastly, McCurry, on behalf of DPS, complied with the search warrant in providing the data to law enforcement, and it was this data that was actually admitted at trial. Therefore, we conclude no plain error occurred at trial with respect to the admission of GPS data concerning Defendant. *See Odom*, 307 N.C. at 660, 300 S.E.2d at 378.

## VI. Refusal to Allow Cross-Examination

In his third argument, Defendant contends the trial court erred by not allowing him to cross-examine Pegg's niece, Riddle, regarding a Facebook message that Pegg sent his mother. He argues that if the message had "been properly allowed in evidence, it would have cast sufficient doubt upon the State's case to have resulted in the jury having reached a different result." We disagree.

"The trial court's determination as to whether an out-of-court statement constitutes hearsay is reviewed *de novo* on appeal." *State v. Castaneda*, 215 N.C. App. 144, 147, 715 S.E.2d 290, 293 (emphasis added), *appeal dismissed*, 365 N.C. 354,

718 S.E.2d 148 (2011).

¶ 58    "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801 (2021). Hearsay is generally inadmissible. N.C. Gen. Stat. § 8C-1, Rule 802 (2021).

¶ 59    In this case, Riddle attempted to testify regarding a Facebook message sent by Pegg to his mother on 22 March 2017. Pegg's message stated: "Knife to a gunfight it is. Heading to Haw Branch with a knife alone, but I saw Jared heading that way. Two birds, one stone or knife, whatever." The trial court conducted a *voir dire* examination regarding the admissibility of testimony concerning Pegg's message. The trial court ruled Riddle's testimony regarding the Facebook message was hearsay because Riddle's grandmother told her about the Facebook message. The trial court did not err in finding Riddle's testimony about the Facebook message was hearsay because the evidence was being offered for the truth of the matter asserted—to show Pegg headed to Haw Branch to partake in a fight on the day he was murdered. *See* N.C. Gen. Stat. § 8C-1, Rules 801. Therefore, the proposed testimony was inadmissible. *See* N.C. Gen. Stat. § 8C-1, Rule 802.

¶ 60    Defendant relies on *State v. McElrath* in support of his argument that the trial court erred in excluding the Facebook message. 322 N.C. 1, 366 S.E.2d 442 (1988). In *McElrath*, the trial court refused to admit into evidence the defendant's exhibit

which was a "drawing found by law enforcement officers among the victim's personal effects [including] a rough map of the area surrounding [the] defendant's North Carolina home and numerous written notations indicating a possible larceny scheme" targeting the defendant's home. *Id.* at 11, 366 S.E.2d at 448. The defendant also offered evidence to show the victim had argued with several other persons and left with those persons on the date that the victim disappeared. *Id.* at 6–7, 366 S.E.2d at 443. Our Supreme Court held that the trial court erred in refusing to admit the document because it "was relevant to a crucial issue in th[e] case," and the defendant met his burden to show the error was prejudicial. *Id.* at 14, 366 S.E.2d at 449–50.

Defendant argues "this case is the same as *McElrath*," and had the trial court admitted the Facebook message, "it would have cast sufficient doubt upon the State's case to have resulted in the jury having reached a different result; thus, he contends the error was prejudicial. We disagree with Defendant's assessment.

We have previously held:

> [t]he rule of relevancy for evidence of [guilt of one other than the defendant] is that it must do more than cast doubt over the defendant's guilt merely because it is possible some other person could have been responsible for the crime with which he has been charged.

> Evidence that another committed the crime for which the defendant is charged generally is relevant and admissible as long as it does more than create an inference or conjecture in this regard. It must point directly to the guilt of the other party. Under Rule 401[,] such evidence must

tend *both* to implicate another *and* be inconsistent with the guilt of the defendant.

*State v. Israel*, 353 N.C. 211, 217, 539 S.E.2d 633, 637 (2000).

¶ 63        In this case, the Facebook message indicates Pegg may have headed to Haw Branch at some time on 22 March 2017 with the intention to fight an undisclosed person; however, Pegg's message does no "more than cast doubt over [D]efendant's guilt merely because it is possible some other person could have been responsible for the crime; it does not "point directly to the guilt of [another] party." *See Israel*, 353 N.C. at 217, 539 S.E.2d at 637. This conclusion is particularly bolstered given Pegg was murdered while he was sitting on his living room couch, and the State's evidence tends to show the bullets and shell casings found at Pegg's home matched bullets in Defendant's possession and were fired from a gun that was in Defendant's possession. Furthermore, the record tends to show Defendant was at the address of Pegg's house on 22 March 2017 during a time when the offense could have been committed and after Pegg was last seen alive. Unlike *McElrath*, Defendant in this case did not present any other evidence to cast doubt upon the State's theory of the case; he solely created an inference that another person was responsible for Pegg's death. *See id.* at 217, 539 S.E.2d at 637. Thus, the proposed evidence is too remote and speculative to be relevant. *See id.* at 217, 539 S.E.2d at 637. Therefore, the trial court properly denied admitting Pegg's Facebook message at trial.

## VII.     Firearm Identification Evidence

¶ 64     In his fourth argument, Defendant contends that the trial court erred by allowing the State's firearm expert to opine the empty, fired, shell casings; the 9mm fired, copper-jacket bullet; and the jacket fragment were all fired from the same Cobray firearm on the basis her opinion lacked a proper foundation.  He further contends Wilson did not testify as to how she applied the principles and methods she normally uses in examining firearms and bullets to this case.  The State argues Wilson's "extensive testimony showed the principles and methods used by her in identifying the murder weapon were reliable."  For the following reasons, we agree with the State.

¶ 65     Defendant acknowledges that he failed to object to the admission of Wilson's expert testimony at trial, but nevertheless argues the trial court committed plain error by allowing her testimony.

¶ 66     "Under the plain error rule, [the] defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Griffin*, 268 N.C. App. 96, 99, 834 S.E.2d 435, 437 (2019) (citation omitted).

¶ 67     N.C. Gen. Stat. § 8C-1, Rule 702 provides:

> (a)     [i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified

as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:

> (1) The testimony is based upon sufficient facts or data.
> (2) The testimony is the product of reliable principles and methods.
> (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a) (2019); *see State v. McGrady*, 368 N.C. 880, 889–90, 787 S.E.2d 1, 8–9 (2016). As we explained in *State v. McPhaul*, "[t]he precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony." 256 N.C. App. 303, 313, 808 S.E.2d 294, 303 (2017), *disc. rev. improvidently allowed,* 371 N.C. 467, 818 S.E.2d 102 (2018). "[A] trial court's ruling on the admissibility of expert testimony will not be reversed on appeal absent a showing of abuse of discretion." *State v. Godwin*, 369 N.C. 605, 610–11, 800 S.E.2d 47, 51 (2017) (internal quotation marks omitted).

¶ 68        The State cites to *State v. Griffin* to argue Wilson's testimony was proper, and the trial court did not commit plain error with respect to the admission of her testimony. 268 N.C. App. 96, 834 S.E.2d 435 (2019). In *Griffin*, our Court rejected the defendant's contention that the trial court plainly erred where the expert witness testified:

> (1)     she was formally educated and trained in forensic science and in the field of firearms examination;

(2)     she tested and analyzed the firearm, bullets, and
        cartridge casings in keeping with the procedures and
        methods learned during her specialized training in
        firearms examination;
(3)     her tests generated data, which she analyzed and
        used to form an opinion on whether or not the bullets
        and casings came from the recovered firearm; and
(4)     the data and conclusion were described in a written
        report and subsequently peer-reviewed by one of
        [her] colleagues in the Firearms Unit.

*Id.* at 108, 834 S.E.2d at 441. Furthermore, the expert witness testified on cross-examination as to national standards set for firearms examination as well as reports and studies conducted in the field of firearms analysis. *Id.* at 108, 834 S.E.2d at 442. We concluded the testimony of the expert witness "show[ed] that her opinion was the product of reliable principles and methods, and that she reliably applied the principles and methods to the facts of the case"; thus, we held the trial court did not abuse its discretion or commit plain error in admitting her testimony. *Id.* at 109, 834 S.E.2d at 442.

¶ 69    In the instant case, Wilson was tendered as an expert in the area of firearms identification and examination without objection upon testifying regarding her formal education and training. According to Wilson, after receiving a master's degree in forensic science, she completed a two-year in-house training program in the firearms section of the North Carolina State Crime Lab. She was a firearms examiner for the North Carolina State Crime Lab from 2011 to 2017. The training involved

both written and practical components, and consisted of a wide range of study topics, including: the history of firearms, ammunition, mechanics of firearms, disassembling and reassembling multiple types of firearms, safety features, the manufacture of firearms, microscopic comparisons, class characteristics, individual characteristics, serial number restorations, and distance determinations. The training also included a final, practical competency examination involving forensic firearm identification.

¶ 70    Wilson worked as a firearms examiner for the Minnesota Bureau of Criminal Apprehension since January of 2018. The number of comparisons she has performed as a firearms examiner "go[es] into the thousands." Wilson had testified as an expert in firearms examination and identification in North Carolina courts approximately twenty-five times.

¶ 71    When asked by the State what makes forensic firearm identification possible, Wilson testified:

> The identification is possible because of the marks that are imparted onto a firearm during the manufacturing process. During the manufacturing process, a manufacturer will make some choices about what kind of firearm they're going to manufacture, and there are some characteristics that they choose and they select. Examples of that would be the number of lands and grooves that they are going to put inside a barrel. Those are raised and lowered portions on the inside of the barrel that grip the bullet and they twist to the right or the left, and that's what imparts spin and stability onto the bullet.
>
> So a manufacturer may choose that they want five lands

and grooves and they're going to twist to the right, or they may opt to have six lands and grooves and twist to the left. Those are class characteristics. So those are more broad and could apply to multiple firearms, multiple models, et cetera.

Another example would be the shape of the firing pin that they are going to manufacture for that firearm. It may be hemispherical. It may be elliptical. These are all decisions that are made prior to the manufacturing process, and these are the class characteristics, or a much broader group of characteristics.

Additionally, during the manufacturing process, but not controlled by the manufacturer, are the individual characteristics. These are aspects of the firearm that are unique to that particular firearm, and it's because of the manufacturing process, it's because of the tools that are used to manufacture, and the mechanisms used to manufacture.

During the manufacturing process, the tools used to manufacture the firearms are stronger. That's how they're able to cut away from basically a steel tube and turn it into a barrel. But during this process, the tools themselves will change to a small degree. Think of it as a piece of sandpaper on wood. As you brush the sandpaper on the wood, the sandpaper is removing particles of that wood. But over time that sandpaper also changes such that it gets dulled and eventually has to be replaced. It's that same aspect with the manufacturing of firearms. So those tools will change, and therefore, they're imparting different marks onto the firearms, one from the next. And then, as well, the tools have to be changed or resharpened as they dull.

The other way that firearms can take on individual characteristics is after they leave the manufacturer, through use, through abuse, through rust, corrosion; all of

those aspects can create individual characteristics.

Those individual characteristics are useful for the
comparative process when they are reproducible, meaning
that they are copied into multiple bullets or multiple
cartridge cases. As a firearms examiner, I'm looking for
that detail that can be seen, that gets copied onto the
cartridge cases or onto the bullets, for example, from the
firearm.

¶ 72        Wilson then testified regarding the process by which she typically examines a

firearm when it comes into her office:

Initially, I would examine the firearm looking for any
damaged or missing components, looking at just the overall
condition of the firearm. I'm going to do a function test on
the firearm. That's going to include examining all the
safety features that are present and testing them to see if
they are functioning properly. That also includes a trigger-
pull determination, which is a measurement of how much
weight has to be applied to the trigger in order for the
firearm to fire. And then as the final step of the function
test, the firearm is test fired. That is where ammunition is
placed into the firearm. This is laboratory ammunition,
typically, and the firearm is test fired. So the trigger is
pulled, the firearm is fired, and the cartridge case and
bullets are collected.

Test firing is generally done in a water tank, which is a big
steel tank full of water. And by shooting into this tank of
water, it slows down the projectiles, the bullets, such that
you can retrieve those bullets, and they are in a pristine or
near pristine condition for any future comparisons in the
case, and this also serves as the last step of the function
exam to show that the firearm is capable of firing.

¶ 73        Next, Wilson testified that she performed the tests described above on the

Ruger 9-millimeter and Cobray 9-millimeter that she examined and had the following

exchange with the State prosecutor regarding her findings:

[Wilson]: [t]he K-1 Cobray pistol functions properly and has a single action trigger pull greater than four pounds, but less than or equal to five pounds.

The K-2 Ruger pistol functions properly. The K-2 Ruger pistol has a single action trigger pull greater than five pounds, but less than or equal to six pounds and a double action trigger pull greater than 11-and-a-half pounds, but less than or equal to 13 pounds.

[State]: And so did both of those firearms fire properly?

[Wilson]: Yes, that's correct.

[State]: And as part of your firearms examination do you look at – you said you examine the firearm itself; is that right?

[Wilson]: Yes.

[State]: Do you ever examine the firing pin on these weapons?

[Wilson]: Yes.

[State]: Was there anything that you noticed about the firing pin on either of these items?

[Wilson]: Yes. As a part of looking at the class characteristics, I note the – for examination purposes if it's going to be used for comparison, then I will look at the shape of

> the firing pin to see if that is in agreement on class characteristics to anything else that I would be comparing it to.

[State]: And did you examine the firing pin on the Ruger 9 millimeter?

[Wilson]: I did not end up comparing the Ruger 9 millimeter to anything in this case. So I did not specifically examine the firing pin.

[State]: Did you examine the firing pin on the Cobray?

[Wilson]: Yes, I did.

[State]: And what, if anything, did you notice about the firing pin on the Cobray?

[Wilson]: I noted that it left a rectangular shaped firing pin impression when firing.

[State]: And based on your training and experience in the time you've been doing firearms examinations, is there anything unique about a rectangular firing pin?

[Wilson]: That is extremely uncommon for a center fire firearm, that would be a firearm that hits the cartridge in the center. While rectangular firing pins are common for your rim-fire caliber firearms, such as your .22 caliber firearms, they are not common for the center-fire firearms such as a 9 millimeter Luger pistol.

¶ 74    Wilson went on to testify regarding how she performs a comparison test:

> A comparison examination is going to be conducted using a comparative microscope. This is a microscope that has a

single eyepiece, but it has two separate stages. So you can
put one item on one stage and a separate item on the other
stage. And when you look through the eyepiece you are
able to see both items simultaneously. So you can lay them
side-by-side and do essentially, a microscopic comparison
between those two.

For the purposes of firearms examination, first what I'll do
is I'll look at those test fired bullets or cartridge cases that
I acquired through the test firing process. I'm looking at
those to see what kind of detail is replicating and suitable
for comparison purposes.

When we do comparative examinations, first we look at
those class characteristics. So those, as I spoke of earlier,
are a more broad category of characteristics. We group
items based off of those class characteristics. If all the
discernible class characteristics are in agreement, then we
continue the examination using the comparative
microscope on individual characteristics. However, if there
is a difference in the class characteristics, such as a bullet
has five land and groove impressions, but the firearm
submitted for comparison has six land and groove
impressions, or lands and grooves . . . then that is a
difference in class characteristics, and that bullet could not
have been fired by that firearm, and therefore, it is
eliminated and the examination is completed at that time.

But if those class characteristics are all in agreement, then
we move on to the individual comparison, and that is done
through the comparative microscope.

¶ 75        Wilson testified she applied the methods and principles of comparison testing,

described above, to the items that were received in this case, including the firearms,

shell casings, bullets, and projectiles. Based on the data, she prepared a report of her

examinations. Wilson concluded items Q-1, Q-2, Q-3, Q-4, Q-5, Q-6, and Q-7, the

silver-colored spent shell casings found around Pegg's body, were all fired from the K-1 Cobray pistol. Item Q-13, a one caliber .38 class fired copper jacket collected from Pegg's jaw, "was determined to have been fired from the same firearm as the Q-8 bullet, the Q-11 jacket fragment [found embedded in wood inside Pegg's home], and the Q-15 bullet. And the Q-13 jacket was fired from the K-1 Cobray pistol." Item Q-15, a one caliber .38 class fired copper-jacketed bullet collected from Pegg's jaw, "was fired from the same firearm as the Q-8 bullet, the Q-11 jacket fragment, and the Q-13 jacket. And the Q-15 bullet was fired from the K-1 Cobray pistol."

¶ 76        On cross-examination, Wilson testified regarding ammunition and the type of ammunition she used in performing the comparison tests in the instant case. She further testified it was not possible that two different weapons fired the rounds she examined.

¶ 77        Like the expert witness's testimony in *Griffin*, Wilson's testimony demonstrates it was "based upon sufficient facts or data" and "is the product of reliable principles and methods." *See* N.C. Gen. Stat. § 8C-1, Rule 702(a); *Griffin*, 268 N.C. App. at 108, 834 S.E.2d at 442. We conclude Wilson's testimony shows she "applied the principles and methods reliably to the facts of the case." *See* N.C. Gen. Stat. § 8C-1, Rule 702(a). Therefore, we hold the trial court did not plainly err by admitting Wilson's expert testimony.

### VIII.    Motion to Dismiss the First Degree Murder Charge

¶ 78        In his final argument, Defendant argues the trial court erred in denying his

motion to dismiss the charge of first degree murder. Specifically, Defendant contends

the State's evidence was insufficient to show malice, premeditation, and deliberation

or that he committed the killing. We disagree.

> We review the trial court's denial of a motion to dismiss de
> novo. A motion to dismiss for insufficient evidence is
> properly denied if there is substantial evidence (1) of each
> essential element of the offense charged, or of a lesser
> offense included therein, and (2) of defendant's being the
> perpetrator of such offense. Substantial evidence is such
> relevant evidence as a reasonable mind might accept as
> adequate to support a conclusion. All evidence, both
> competent and incompetent, and any reasonable inferences
> drawn therefrom, must be considered in the light most
> favorable to the State. Additionally, circumstantial
> evidence may be sufficient to withstand a motion to dismiss
> when a reasonable inference of defendant's guilt may be
> drawn from the circumstances. If so, it is the jury's duty to
> determine if the defendant is actually guilty.

*State v. Blakney*, 233 N.C. App. 516, 518, 756 S.E.2d 844, 846 (2014) (citation

omitted). "The State is entitled to every reasonable inference to be drawn from the

evidence. Contradictions and discrepancies do not warrant dismissal of the case;

rather, they are for the jury to resolve. Defendant's evidence, unless favorable to the

State, is not to be taken into consideration." *State v. Franklin*, 327 N.C. 162, 172,

393 S.E.2d 781, 787 (1990) (citations omitted).

¶ 79        To convict a defendant of first degree murder under N.C. Gen. Stat. § 14-17,

"the State must prove: (1) an unlawful killing; (2) with malice; (3) with the specific

intent to kill formed after some measure of premeditation and deliberation." *State v. Peterson*, 361 N.C. 587, 595, 652 S.E.2d 216, 223 (2007), *cert. denied*, 552 U.S. 1271, 128 S. Ct. 1682, 170 L. Ed. 2d 377 (2008).

¶ 80     "[T]o overcome a motion [to dismiss in a murder case] and justify a conviction of the defendant, the State must offer evidence from which it can be reasonably inferred (1) that deceased died by virtue of a criminal act, and (2) that the act was committed by the defendant." *State v. Lee*, 294 N.C. 299, 302, 240 S.E.2d 449, 451 (1978) (citations omitted). "In order for the trial court to submit a charge of first degree murder to the jury, there must have been substantial evidence presented from which a jury could determine that the defendant intentionally . . . killed the victim with malice, premeditation and deliberation." *State v. Corn*, 303 N.C. 293, 296, 278 S.E.2d 221, 223 (1981).

¶ 81     Here, the parties do not dispute Pegg "died by virtue of a criminal act"; thus, we turn to the issue of whether the act was committed by Defendant. *See Lee*, 294 N.C. at 302, 240 S.E.2d at 451.

**C. Substantial Evidence of Defendant as the Murderer**

¶ 82     Our Courts have considered factors such as "proof of motive, opportunity, capability, and identity" when determining whether the evidence shows that a particular person committed a particular crime. *State v. Bell*, 65 N.C. App. 234, 238, 309 S.E.2d 464, 467 (1983), *aff'd*, 311 N.C. 299, 316 S.E.2d 72 (1984). Although these

factors are not essential elements of first degree murder, they "are circumstances which are relevant to identify an accused as the perpetrator of a crime." *Id.* at 238, 309 S.E.2d at 467. "[W]here the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion to dismiss should be allowed." *State v. Hayden*, 212 N.C. App. 482, 484, 711 S.E.2d 492, 494 (2011) (citation and internal quotation marks omitted).

¶ 83        Relying on North Carolina Supreme Court cases of *State v. Cutler*, 271 N.C. 379, 156 S.E.2d 679 (1967), *State v. White*, 293 N.C. 91, 235 S.E.2d 55 (1977), *State v. Lee*, 294 N.C. 299, 240 S.E.2d 449 (1978), *State v. Jones*, 280 N.C. 60, 184 S.E.2d 862 (1971), and *State v. Hood*, 77 N.C. App. 170, 334 S.E.2d 421 (1985), Defendant argues the State's circumstantial evidence was insufficient to show he committed the murder.

¶ 84        In *State v. Cutler*, the Court held that there was insufficient evidence to establish that the defendant had an opportunity to commit the crime charged, although it could be reasonably inferred from the evidence that the defendant was at the home of the deceased around the time the victim died. 271 N.C. at 383, 156 S.E.2d at 682.

¶ 85        In *State v. White*, the Court held that the State had established that the defendant had an opportunity to commit the crime charged, but there was no other

evidence of the defendant's guilt. 293 N.C. at 97, 235 S.E.2d at 59.

¶ 86    In *State v. Lee*, the Court held the defendant's motion to dismiss was erroneously denied because the "State failed to offer substantial evidence that the defendant was the one who shot [the victim]" despite any "inference that the "defendant bore malice toward [the victim]." 294 N.C. at 302–03, 240 S.E.2d at 451.

¶ 87    In *State v. Jones*, the Court reversed a trial court's grant of the defendant's motion to dismiss. 280 N.C. at 67, 184 S.E.2d at 866. The State presented evidence sufficient to show the defendant had an opportunity to commit the crime, but the "State failed to offer substantial evidence that [the] defendant was the one who shot his wife" to link the empty cartridges found in the defendant's pocket to the bullets that killed the victim. *Id.* at 65–67, 184 S.E.2d at 865–66.

¶ 88    Finally, in *State v. Hood*, the Court held that "neither motive nor opportunity" could be reasonably inferred from the evidence of the case. 77 N.C. App. at 173, 334 S.E.2d at 423 (emphasis omitted). A witness heard a gunshot fired in the direction of the victim's residence and then saw the defendant drive away. *Id.* at 173, 334 S.E.2d at 423. The Court noted that "[t]here [was] no evidence that [the] defendant had access to the [victim's residence] or that he otherwise gained entrance to it. There [was] no evidence that [the] defendant was armed or that the deceased was present in [his residence] at the time." *Id.* at 173, 334 S.E.2d at 423.

¶ 89    The above cases are distinguishable from the instant case where there is

substantial evidence Defendant had the opportunity to commit the crime and was capable of doing so. *See Bell*, 65 N.C. App. at 238, 309 S.E.2d at 467. Furthermore, there is substantial evidence that Defendant possessed the murder weapon as well as the same ammunition that was used to shoot Pegg, and he was armed at a time when a reasonable jury could find Defendant committed the crime. *See Jones*, 280 N.C. at 67, 184 S.E.2d at 866. Finally, the record shows Pegg's house was unlocked when he was at home; Defendant could have easily gained entrance to the home given it was unlocked, and Defendant was presumably familiar with the home given the prior work he performed at the house. *See Hood*, 77 N.C. App. at 173, 334 S.E.2d at 423. We now discuss Defendant's opportunity and capability of committing the murder of Pegg.

### 1. *Opportunity*

¶ 90        Defendant argues there is "absolutely no evidence of . . . opportunity" in this case. The State contends there is sufficient evidence to show Defendant had the opportunity as well as the means to commit murder.

¶ 91        "In order for this Court to hold that the State has presented sufficient evidence of [the] defendant's opportunity to commit the crime in question, the State must have presented at trial evidence not only placing the defendant at the scene of the crime, but placing him there at the time the crime was committed." *Hayden*, 212 N.C. App. at 488, 711 S.E.2d at 497.

¶ 92    In this case, the State's evidence showed Defendant's electronic monitoring device placed Defendant in the vicinity of Pegg's home and at the scene of the crime on 22 March 2017—one day before the deceased body was found and on the same day Pegg was last seen alive, and at a time when a reasonable jury could find the crime could have been committed. *See State v. Miles*, 222 N.C. App. 593, 601, 730 S.E.2d 816, 823 (2012) (holding testimony that the defendant was seen at the victim's house coupled with phone records pinpointing the defendant to the vicinity of the victim's home and site of the crime established the defendant had the opportunity to commit the murder in light of the State's evidence as a whole), *aff'd*, 366 N.C. 503, 750 S.E.2d 833 (2013).

¶ 93    Additionally, the State presented the testimony of Carson, whom Defendant told he, "was going up the road to take care of some business," while Defendant was located on the same road as the victim's house. Defendant made his statement after he showed Carson a firearm matching the description of the murder weapon. Considering the evidence in the light most favorable to the State, a reasonable jury could conclude that Defendant was in the vicinity of Pegg's home and the scene of the crime at the time of Pegg's death, which would establish Defendant had the opportunity to commit the murder. *See Blakney*, 233 N.C. App. at 518, 756 S.E.2d at 846.

    **2. Capability**

¶ 94        Our courts have held evidence of opportunity by itself is insufficient to carry a first degree murder case to the jury. *See Bell*, 65 N.C. App. at 238–39, 309 S.E.2d at 467. Thus, we next consider whether Defendant was capable of committing the murder. *See id*. at 238, 309 S.E.2d at 467.

¶ 95        In the instant case, silver-colored shell casings with the headstamp of FC LUGER 9 MM found around the victim's body matched the ammunition that was found in Defendant's truck by law enforcement on 22 March 2021, shortly after Defendant was in the vicinity of Pegg's home, based on GPS data provided at trial. The search of Defendant's truck and home also revealed Defendant possessed multiple guns, one of which was later determined to be the murder weapon. Thus, the record contains sufficient evidence to permit a reasonable jury to find he had the capability to commit first degree murder. *See Lee*, 294 N.C. at 302, 240 S.E.2d at 451.

¶ 96        Although the State's evidence was solely circumstantial in this case, the evidence did more than "raise a suspicion or conjecture as to . . . the identity of [D]efendant as the perpetrator of it." *See Hayden*, 212 N.C. App. at 484, 711 S.E.2d at 494. Rather, the evidence was sufficient to survive a motion to dismiss as a reasonable jury could infer Pegg's death was a result of Defendant's criminal act. *See Blakney*, 233 N.C. App. at 518, 756 S.E.2d at 846; *Bell*, 65 N.C. App. at 238, 309 S.E.2d at 467. We hold there was substantial evidence that Pegg's murder was committed by Defendant when we consider all of the evidence in the light most

favorable to the State. *See id.* at 518, 756 S.E.2d at 846; *Lee*, 294 N.C. at 302, 240 S.E.2d at 451.

### 3. *Motive, Premeditation, & Deliberation*

¶ 97    Defendant asserts the State's case failed to present substantial evidence of malice, premeditation, and deliberation. We disagree.

¶ 98    It is well-established by our Courts that "malice is presumed where the defendant intentionally assaults another with a deadly weapon, thereby causing the other's death." *State v. Leazer*, 353 N.C. 234, 238, 539 S.E.2d 922, 925 (2000) (citation omitted). "Premeditation means that the act was thought over beforehand for some length of time; however, no particular amount of time is necessary for the mental process of premeditation." *State v. Trull*, 349 N.C. 428, 509 S.E.2d 178 (1998), *cert. denied*, 528 U.S. 835, 120 S. Ct. 95, 145 L. Ed. 2d 80 (1999). "Deliberation means an intent to kill carried out by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *State v. Hamlet*, 312 N.C. 162, 170, 321 S.E.2d 837, 842–43 (1984) (citation omitted). "The phrase 'cool state of blood' means that the defendant's anger or emotion must not have been such as to overcome the defendant's reason." *Id.* at 170, 321 S.E.2d at 843 (citation omitted).

¶ 99    "Premeditation and deliberation are mental processes which are ordinarily not

susceptible to proof by direct evidence." *State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d

592, 596 (1992). Our Supreme Court

> has identified several examples of circumstantial evidence, any one of which may support a finding of the existence of [premeditation and deliberation]: (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Childress*, 367 N.C. 693, 695, 766 S.E.2d 328, 330 (2014) (citation omitted).

¶ 100        Here, there is a presumption of malice given the evidence tends to show Pegg

was intentionally killed with a deadly weapon. *See Leazer*, 353 N.C. at 238, 539

S.E.2d at 925. There is also substantial evidence the killing was premeditated and

deliberate. *See Blakney*, 233 N.C. App. at 518, 756 S.E.2d at 846; *Childress*, 367 N.C.

at 695, 766 S.E.2d at 330. Pegg was found in a seated position on his couch with

multiple gunshot wounds to his head. A reasonable jury could conclude Pegg did

nothing to provoke Defendant. *See State v. Rose*, 339 N.C. 172, 195, 451 S.E.2d 211,

224 (1994) (stating the victim's position of sitting in a chair with a pillow or blanket

on his chest indicated a lack of provocation on his part), *cert. denied*, 515 U.S. 1135,

115 S. Ct. 2565, 132 L. Ed. 2d 818 (1995). The multiple shots fired support an

inference of Defendant's premeditation and deliberation. *See State v. Taylor*, 362 N.C. 514, 533, 669 S.E.2d 239, 258 (2008), *cert. denied*, 558 U.S. 851, 130 S. Ct. 129, 175 L. Ed. 2d 84 (2009). At around the time that a reasonable jury could infer the murder occurred, Defendant showed Carson a 9-millimeter firearm, consistent with the description of the murder weapon. He also told Carson he "had to go up the road to take care of some business." A reasonable jury could infer that Defendant intended to travel up Dillingham Road to Pegg's house to kill Pegg. *See State v. Williams*, 151 N.C App. 535, 540, 566 S.E.2d 155, 159 (2002) (reasoning that bringing a revolver to a meeting indicated "some preparation and intent to do [the victim] harm").

¶ 101        The evidence tends to show Defendant fired three shots into Pegg's head, two of which were discharged at close range. This indicates Pegg was shot after he had been felled and rendered unconscious, and he was killed in a brutal manner. *See Childress*, 367 N.C. at 695, 766 S.E.2d at 330. In light of such evidence, we hold there was substantial evidence of premeditation and deliberation; thus, the trial court did not err in denying Defendant's motion to dismiss the charge of first degree murder and submitting the charge to the jury. *See Blakney*, 233 N.C. App. at 518, 756 S.E.2d at 846; *Corn*, 303 N.C. at 296, 278 S.E.2d at 223.

## IX.    Conclusion

¶ 102        We hold the trial court did not err in denying Defendant's motion to suppress any evidence seized during the search of his residence because the affidavit was

sufficient on its face. Further, the trial court's findings of fact are supported by competent evidence, and its conclusions of law are supported by findings of fact in its order on the motion to suppress. The trial court did not commit plain error by denying Defendant's motion to suppress any evidence of Defendant's electronic monitoring data because Defendant did not cite to a statutory mechanism allowing him to suppress such evidence, DPS waived its privilege with respect to the data by verbally releasing it to law enforcement, and the GPS evidence actually admitted at trial was the product of law enforcement's search warrant.

¶ 103        The trial court did not err by disallowing the State's witness to testify concerning the murder victim's Facebook message because it was hearsay. Even if the message was offered for a non-hearsay purpose, Defendant failed to show the message was relevant because he did no more than create an inference as to another person's guilt of the crime. The trial court did not plainly err in admitting testimony of the State's expert witness on firearm identification and examination because her testimony met the requirements under N.C. Gen. Stat. § 8C-1, Rule 702(a). Lastly, the trial court did not err in denying Defendant's motion to dismiss because the State presented substantial evidence that Defendant committed the murder, and that he acted with malice, premeditation, and deliberation. Accordingly, we conclude Defendant received a fair trial, free of prejudicial error.

NO ERROR.

Judges TYSON and GORE concur.